UNITED STATES of America, Appellant/Cross Appellee No. 88–3268

v.

Alan FRANK, a/k/a A. Roy, Appellee/Cross Appellant No. 88–3220.

Nos. 88–3220 and 88–3268.

United States Court of Appeals, Third Circuit.

Argued July 28, 1988.

Reargued (No. 88–3220): Sept. 30, 1988.

Decided Nov. 7, 1988.

Rehearing and Rehearing In Banc Denied Jan. 4, 1989.

W. Penn Hackney (Argued and Reargued), Pittsburgh, Pa., for Alan Frank.

J. Alan Johnson, U.S. Atty., Constance M. Bowden (Argued and Reargued), Asst. U.S. Atty., Pittsburgh, Pa., John R. Bolton, Asst. Atty. Gen., Douglas Letter, Gregory

C. Sisk (Argued), Attorneys, Appellate Staff Civil Div., Dept. of Justice, Washington, D.C., for United States.

Paul M. Bator (Argued), Andrew L. Frey, Kenneth S. Geller, Stephen G. Gilles, Mayer, Brown & Platt, John R. Steer, General Counsel, Donald A. Purdy, Jr., Deputy General Counsel, U.S. Sentencing Com'n, Washington, D.C., for amicus curiae U.S. Sentencing Com'n.

Before GIBBONS, Chief Judge, SEITZ and HUTCHINSON, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge.

Alan Frank appeals from a judgment of sentence imposed following his conviction on a charge of interstate flight to avoid prosecution. He contends that the indictment should have been dismissed because the prosecution was not authorized in the manner required by 18 U.S.C. § 1073. He also contends that the evidence is insufficient to sustain his conviction. Alternatively he contends that he is entitled to a new trial because the district court erred in denying his motions for the suppression of certain evidence and in refusing to give certain requested instructions. The United States appeals pursuant to 18 U.S.C. § 3742(b)(1) from the judgment of sentence because the district court refused to apply the sentencing guidelines to this post-November 1, 1987 offense. We will affirm Frank's conviction, but will remand for resentencing.

### Frank's Appeal

#### I

In November 1986 Frank, a Pennsylvania attorney with federal court experience, was informed by Detective Donald Fox of the Allegheny County Police Department that it was possible that criminal charges with respect to forgery and theft of municipal bonds would be brought against him. Thereafter, Frank embarked on a cruise on his son's yacht. While he was gone, on January 5, 1987, Detective Fox filed a state criminal complaint charging Frank with theft and forgery. Fox obtained a warrant for Frank's arrest, but was unable to execute it because Frank was then in the Bahamas. On January 8, 1987, a federal criminal complaint was filed charging Frank with unlawful flight to avoid prosecution in violation of 18 U.S.C. § 1073. A warrant for Frank's arrest was issued by the United States District Court for the Western District of Pennsylvania, and the Federal Bureau of Investigation began a search for him.

In the fall of 1987 Frank returned to Allegheny County, where on November 5 he was arrested at the Viking Motel by two FBI agents. On November 6, 1987, he was arraigned before a United States Magistrate on the interstate flight charge and he requested a preliminary examination. Frank was detained and eventually indicted and prosecuted on the interstate flight charge.

#### II

The statute for violation of which Frank was convicted provides in relevant part:

Whoever moves or travels in interstate or foreign commerce with intent ... to avoid prosecution ... shall be fined not more than $5,000 or imprisoned not more than five years, or both.

Violations of this section may be prosecuted ... only upon formal approval in writing by the Attorney General or an Assistant Attorney General of the United States, which function of approving prosecutions may not be delegated.

18 U.S.C. § 1073 (1982). The first quoted paragraph is traceable to the Fugitive Felon Act of 1934. Pub.L. No. 233, 48 Stat. 782. *See Barrow v. Owen,* 89 F.2d 476 (5th Cir.1937). It was passed for the purpose of permitting the Federal Bureau of Investigation to participate in the apprehension of persons fleeing across state lines after committing designated offenses. The second paragraph was added by the Fugitive Felon Act of 1961, Pub.L. No. 87–368, 75 Stat. 795, which also broadened the first paragraph to include all felonies.

Thus the relevant legislative history is that of the 1961 Act.

██ Consistent with the original purpose of the Act, which is to permit federal law enforcement officers to assist local law enforcement by apprehending fleeing felons, the second paragraph has never been construed to require consent from a high official of the Department of Justice for the filing of a charge, the issuance of an arrest warrant, or the arrest and detention of a fugitive. *See United States v. Diaz*, 351 F.Supp. 1050 (D.Conn.1972) (warrant may issue without Attorney General's approval); *United States v. McCarthy*, 249 F.Supp. 199 (E.D.N.Y.1966) (filing complaint and arrest valid without Attorney General's approval). Indeed, to construe section 1073 as requiring approval from the highest level of the Justice Department for a complaint, a warrant, or an arrest would serve to frustrate the federal law enforcement agencies by preventing them from going into action promptly, and it would set a premium on a quick get-away across state lines by the criminal. *United States v. Bando*, 244 F.2d 833, 843 (2d Cir.), *cert. denied*, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957). Therefore, as used in the second paragraph of section 1073, the term "prosecution" cannot refer to the filing of a complaint, authorized by Fed.R.Crim.P. 3, to the issuance of an arrest warrant, authorized by Fed.R.Crim.P. 4(a), to the execution of a warrant, authorized by Fed.R. Crim.P. 4(d)(3), to the initial appearance before a magistrate, required by Fed.R. Crim.P. 5(a), or to the preliminary examination required, unless waived, by Fed.R. Crim.P. 5.1. Likewise, because since 1934 the basic purpose of the statute has been to provide federal assistance in apprehending fugitives from state prosecution, on determining probable cause to believe that a violation of section 1073 has occurred, a magistrate must have the authority at least to detain a defendant until such time as he may be taken into state custody, without the approval of the highest levels of the Department of Justice.

At the Rule 5 and 5.1 hearing on November 6, 1987, Frank called to the Magistrate's attention the fact that no written approval of prosecution had been procured, and moved to dismiss the complaint. That motion was properly denied because, even absent such approval, the magistrate was authorized to determine probable cause and to detain Frank. At the same November 6, 1987 hearing the Assistant United States Attorney informed Frank and the magistrate that, in a telephone conversation that day, an Acting Assistant Attorney General in the Criminal Division of the Department of Justice had authorized the United States Attorney to proceed with prosecution. Thus Frank was put on notice that more federal proceedings were contemplated than merely finding probable cause and detaining him until he could be turned over to the Pennsylvania authorities.

The United States Attorney presented the section 1073 charge to a grand jury, which returned an indictment on December 3, 1987. At the time the indictment was returned the United States Attorney still had not obtained any written approval from Washington for proceeding with prosecution. Written approval was received on December 24, 1987, in a letter signed by Acting Assistant Attorney General John C. Keeney. The letter also contains a typed reference to William F. Weld, Assistant Attorney General, Criminal Division, but Weld's signature does not appear (although the letter pre-dated Assistant Attorney General Weld's resignation by approximately three months).

The section 1073 offense is not one which can be tried before a magistrate. Accordingly, after the Rule 5.1 hearing, proceedings took place before a district judge. At a detention hearing on December 17, 1987, Frank asked the district judge to dismiss the indictment sua sponte. 26 Supplementary Appendix (SA). From the sequence of the colloquy at that hearing it appears that Frank relied upon the ground that there can be no flight to avoid prosecution until state charges are actually filed. The court denied the motion without prejudice, advising Frank to file a written motion to which the government could respond. *Id.* At that point, Frank mentioned the absence of written authority to prosecute as a ground

for dismissal sua sponte, and contended that "I think it's not one of those where the motion need be filed." *Id.* He continued, "[I] asked for [written authority] earlier, asked for it a second time, Mr. Manning finally gave me the truth today, it was on its way. That's the same answer I heard before." *Id.* Directing Frank back to the issue of risk of flight, which was the subject of the detention hearing, the court refused to consider the motion. No written motion was ever filed on Frank's behalf with respect to the issue of approval of the prosecution.

The motion to dismiss because of the absence of written approval which was made to the magistrate in the Rule 5.1 hearing cannot be construed as a preservation of the approval issue, because it was made at a stage of the proceedings when such approval was not required and thus was properly denied. Nor was the approval issue properly preserved before the district judge. There is no basis on which Frank could assume that the district judge would consider the motion before the magistrate to have raised the issue for subsequent stages of the case. The only instance in which, prior to trial, Frank called the issue to the district judge's attention is Frank's reference to the absence of approval in the December 17, 1987 detention hearing. The colloquy from that hearing, quoted above, is quite unspecific. It clearly did not alert the court to the question whether Acting Assistant Attorney General Keeney was one of the persons who could sign a written approval. Indeed, at that time, neither Frank nor the court nor the Assistant United States Attorney knew who would sign. Nor did it alert the district judge to the contention that the written approval was untimely. The indictment was already returned, but no one in the courtroom knew on December 17 whether a written approval had not been signed or had been signed at an earlier time, and merely delayed in transmission. Timeliness of the approval was not mentioned at all. Moreover, the court clearly stated that a written motion, to which the government might respond, would be considered if it was filed. Frank has offered no explanation for his failure

to pursue that suggestion. In sum, the issue of approval of the prosecution, at the indictment stage and later, was never fairly presented to the district court, was never ruled upon, and should not be considered now unless plain error resulted from improper approval in this case. Fed.R.Crim. P. 12(b)(1); Fed.R.Crim.P. 52(b). For the reasons which follow we see no such plain error.

We start with the purpose of the statutory requirement of approval to prosecute, as disclosed in its scant legislative history. The basic thrust of the 1961 Act was to increase the instances in which federal law enforcement officials would assist local law enforcement officials by apprehending fleeing felons. The report on the bill which became the 1961 Act reveals that the Justice Department contemplated the likelihood that, although federal trials of section 1073 cases might occur, in most instances it would continue the existing practice of returning the fugitive in order to bring him to trial before a state court. H.R.Rep. No. 827 (87th Cong.) 1st Sess., reprinted in 1961 U.S.Code Cong. & Admin.News 3242, 3243. Congressman Libonati, who apparently wanted further assurances in this respect, offered an amendment which became the second quoted paragraph. 107 Cong.Rec. 16849, 16862 (1961). It is not entirely clear what his purpose was. Possibly he and the others who voted in favor of the amendment were interested in the preservation of scarce federal prosecutorial resources. Possibly they were motivated by federalism concerns such as letting the states punish their own offenders when the federal role of apprehending them was complete. Finally, Congressman Libonati, but no other member of Congress, made a passing reference to the undesirability of prosecuting the same person two or more times for actions arising out of a single criminal act. H.R.Rep. No. 827, reprinted in 1961 U.S. Code Cong. & Admin.News at 3245 Minority Views. We will assume, arguendo, that each of these three purposes animates the approval requirement. None of them, however, is relevant to proceedings under Fed. R.Crim.P. 3, 4, 5 or 5.1, since, as noted

above, the undertaking of those proceedings without prior approval is necessary for the accomplishment of the law's overriding purpose of apprehending fleeing felons and holding them for the states. The other three purposes only become relevant at subsequent stages.

Our plain error analysis starts with the question whether, had Frank made the motion which the court invited, the government could have cured the defect on which he now relies, keeping in mind the three purposes which are arguably relevant at prosecutorial stages subsequent to arrest and detention. If we look upon Frank's *trial* as the prosecution, it is clear that the defect could have been cured. Had the issue of absence of a signature by the Attorney General or an Assistant Attorney General been raised in a motion, one of the designated officials could then have considered (1) whether federal resources should be expended in the trial, (2) whether federalism concerns warranted deference to Pennsylvania, and (3) whether Frank should be exposed to the risk of prosecution by two sovereignties. A signature any time before trial would fully vindicate each of these purposes. We cannot at this stage, therefore, treat the absence of a readily obtainable signature as plain error when the government, had a motion been made, could have rectified it.

■ The timing of the approval is another matter. Frank urges that absent a written approval the United States Attorney should not even have presented the section 1073 case to the grand jury. We do not see how the three arguably relevant policies behind the approval requirement would be significantly advanced by such a reading of the statute. Conceivably in some instances a United States Attorney might want to conduct a grand jury investigation to determine if a section 1073 charge was appropriate, and obtain an indictment under section 1073 before obtaining an arrest warrant. The grand jury's action obviously would provide probable cause for issuance of a warrant. In such a case the three arguably relevant purposes of the statute could be served by having the Attorney General or an Assistant Attorney General decide, after a defendant's apprehension, whether to go forward with a trial. In Frank's case, moreover, the head of the Criminal Division approved the prosecution on November 6, 1987, before the matter was ever presented to the grand jury. The technical absence of a writing was curable. *Cf. United States v. Acon*, 513 F.2d 513, 518 (3d Cir.1975) (absence of written approval prior to wiretap application does not require suppression if actual approval was timely). Frank urges that even if the approval was timely the wrong person made the approval. Since the government never had an opportunity to respond to a motion on the approval issue we do not actually know whether an Assistant Attorney General did in fact participate in the approval with Mr. Keeney. Whether or not that is the case, however, the result for plain error purposes would be the same. Had the issue been raised by motion, an approval by the Attorney General or an Assistant Attorney General could have been obtained, and the charge resubmitted to the same grand jury. Thus, even with respect to the grand jury's action, we cannot find plain error.

In advancing, belatedly, the contention that the indictment should be dismissed, Frank places principal reliance on *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), which holds that in the absence of the statutorily required approval of a wiretap application by one of the designated officials of the Justice Department, the fruits of a court authorized electronic surveillance must be suppressed. For several reasons *Giordano* is not controlling. First, the congressional purpose in requiring approval by a politically responsible official of the Department of Justice was to minimize the resort to invasions of privacy rights guaranteed by the Federal Communications Act and the fourth amendment. Here the only right arguably personal to Frank is the non-statutory and non-constitutional right to have a high-level official decide whether to expose him to a permissible dual sovereignty prosecution. The personal interest in avoiding dual sovereignty prosecutions,

which are permissible, does not parallel the interest in sparing persons of illegal invasions of their privacy which accounted for the need for politically responsive decision-making in *Giordano*. Preservation of federal resources and deference to the states are not interests personal to Frank. Second, the statute which the court addressed in *Giordano* explicitly mandated suppression of evidence for its violation, 18 U.S.C. § 2515, a factor the Supreme Court found to be significant. *Giordano*, 416 U.S. at 524, 94 S.Ct. at 1831. Section 1073, by contrast, does not specify any specific relief. Finally, and most significantly, the defendant in *Giordano* preserved the suppression issue by making an appropriate motion, to which the government had an opportunity to respond, while Frank did not. Had the defendant in *Giordano* not done so, his suppression motion would have been waived. Fed.R.Crim.P. 12(b)(3). We hold, therefore, that the indictment should not be dismissed.

### III

Frank moved pre-trial to suppress evidence seized from a rental car which was in his possession at the time of his arrest, and evidence seized in the course of the execution of a search warrant at his former wife's home. Legality of the two seizures requires separate treatment.

### A

When Frank was arrested on Thursday, November 5, 1987, he was seated in a parked rented car in the parking lot of the Viking Motel. The arresting FBI agents locked and secured the car, taking the keys. They then telephoned Detective Fox of the Allegheny County Police Department, who caused the car to be brought to the impoundment lot which that Department maintained at the Greater Pittsburgh Airport. Fox did not search the car at that time but left instructions that an inventory search was to be left to him and his partner, Detective Heyl, at the earliest practical date. On Sunday, November 8, 1987, Frank requested Allegheny County Police Supervisor Neveling to give the personal

belongings in the car to his family. Detective Fox was unable to conduct an inventory search prior to that time, because he and Heyl had to appear at Frank's bail hearing on Friday, November 6, and Fox did not work that Saturday, Sunday or Monday. The Police Department arranged for a representative of the rental company that owned the car to come to the impoundment area, and in the presence of that representative, Detectives Fox and Heyl conducted a search.

The search involved opening the glove compartment and the locked trunk, and removing from the trunk and opening a zippered garment bag. The zippered garment bag contained, among other things, a file of papers in a manila envelope. A copy of the car rental agreement was taken from the glove compartment. When the representative of the car rental agency disclaimed ownership of any items in the garment bag, it was taken to police headquarters, where an inventory list was prepared. The police retained papers deemed to be of investigative significance and turned the rest of the property over to Frank's daughter. A detailed list of the returned items was retained. As will be seen in our later discussion of the sufficiency of the evidence, some of the seized papers were significant to the government's case. Frank moved to suppress them, and the district court denied the motion after an evidentiary hearing. The court ruled:

> We also find no merit to defendant's motion with respect to the inventory search of the Lincoln automobile at the airport on November 10, 1987. The law is settled that a warrantless inventory search of a motor vehicle is authorized under the instant circumstance. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1979); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1966). The evidence established that the police complied with all written and oral procedures and regulations incidental to such searches, and defendant's motion must be denied.

We also note that the Supreme Court stated in *South Dakota v. Opperman* at

page 369, 96 S.Ct. at page 3097 as follows: When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobile's contents. These procedures developed in response to three distinct needs. The protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger. The practice has been viewed as essential to respond to incidents of theft or vandalism. In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned. These caretaking procedures have almost uniformly been upheld by the State Courts which, by virtue of the localized nature of traffic regulations, have had considerable occasion to deal with the issue. Applying the Fourth Amendment standard of reasonableness, the State Courts have overwhelmingly concluded that even if an inventory search is characterized as a search, the intrusion is constitutionally permissable.

All three factors are applicable here and controlling. Accordingly, Defendant's motion to suppress will be denied.

J.A. 223–27. Frank contends that this ruling was both factually and legally erroneous. We must defer to the district court's findings of fact unless they are clearly erroneous, but our review of the standards for inventory searches applied by the district court is plenary.

▮ Frank's first factual contention is that the district court's finding that the searches of the car and the zippered bag were inventory searches is clearly erroneous. Antecedent to the question whether the inventory of the vehicle's contents is the question whether the impoundment of the vehicle was itself an unlawful seizure. It is far from clear on the record before us that this question was raised in the suppression hearing, except to the extent that it bore upon the motives of Detective Fox in making the inventory. Assuming that the issue was preserved, however, we hold that the FBI agents acted reasonably when, following Frank's arrest in a vehicle containing personal property, they locked the vehicle and caused it to be removed from the public parking area of a motel to a secure impoundment location. Thus the vehicle lawfully came into police custody. According to Frank, the evidence nevertheless compels a conclusion that Fox used the inventory search as a mere pretext for a warrantless investigatory search. He points to Detective Fox's acknowledgement that he lacked probable cause to obtain a search warrant, and to Fox's knowledge of Frank's fugitive status. The mere fact that an inventory search may also have had an investigatory purpose does not, however, invalidate it. *United States v. Orozco*, 715 F.2d 158, 161 (5th Cir.1983). The fact that Detective Fox was also the officer in charge of the investigation into Frank's alleged frauds does not require a different conclusion. *See United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir.1982). Supporting the district court's finding that the search was an inventory search is the evidence that the arresting FBI agents turned the car over to the Allegheny County Police Department for custody because the federal government does not have its own impoundment lot. Detective Fox was the officer who accepted custody of the car from the FBI, and who arranged to tow it to the impoundment area. Lieutenant Kowalski, the commanding officer of the impoundment facility, testified: "The procedure for my officers who are charged with towing a vehicle for impoundment is the arresting or investigating officer is responsible for the inventory of that vehicle." J.A. 110. He reiterated that "[w]henever a vehicle comes to the airport the detective or officer putting the vehicle into the impound lot is responsible for the inventory and search of that vehicle." J.A. 115. Kowalski further testified that the purpose for such inventory searches was "to protect the property inside the vehicle," and "caretake" functions in general. J.A. 111. Detective Fox testified that he and Detective Heyl, as the investigating officers, conducted the inventory search in accordance with police procedure. J.A. 137. Fox in fact

made inventory lists of all personal property, both property retained and property turned over to Frank's daughter. J.A. 138–39, 150. The search and inventory lists were made following a request from Frank that his personal property be retrieved from the rental car and turned over to his family. Given this evidence, we cannot hold that the district court's conclusion that the search was an inventory search is clearly erroneous.

■ The same must be said about Frank's objection to the court's conclusion that "[t]he evidence established that the police complied with all written and oral procedures and regulations incidental to such searches." Lieutenant Kowalski testified to standard police procedures applicable to impounded vehicles, and Detective Fox testified that he followed them. It is true that the Allegheny County Police Department had no written procedures governing inventory searches, but Kowalski's testimony set forth unwritten standard procedures, applicable to all impounded vehicles, and according to the evidence these were complied with. The court's reference to written procedures undoubtedly is to the evidence that a towing report was written, an impound slip recorded the impoundment, and inventory lists were prepared.

Frank's legal argument, predicated upon dicta in *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 742, n. 6, 93 L.Ed.2d 739 (1987), is somewhat independent of his objections to the district court's factfinding. He urges that even accepting the facts as found, no legally valid inventory search occurred because there is no finding or evidence that the Allegheny County Police Department was following pre-exiting standardized procedures. To put Frank's argument in context, a brief review of the law of inventory searches is appropriate.

The Supreme Court first recognized the inventory search exception to the warrant requirement in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed. 2d 1000 (1976), holding that the contents of vehicles taken into police custody may be inventoried without a warrant, probable cause, or reasonable suspicion.[1] In *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) the court applied the inventory exception to the search of a handbag of a person lawfully arrested and detained. The *Opperman* opinion identified three justifications for the inventory exception: protection of the owner's property while it was in police custody; protection of the police against claims of lost or stolen property; and protection of the police from danger. *Id.* 428 U.S. at 369, 96 S.Ct. at 3097. These strong governmental interests, said the Court, sufficed to justify a routine inventory of the contents of impounded automobiles. In *Opperman* the opinion of the Court refers, descriptively, to the fact that the inventory was made "using a standard inventory form pursuant to standard police procedures." *Id.* at 366, 96 S.Ct. at 3095. The opinion does not suggest that the standard police procedures were reflected in a pre-existing formalized policy, written or oral. In a concurring opinion Justice Powell, relying on the administrative search and roadblock exceptions to the warrant requirement an-

---

1. Chief Justice Burger explained:

 In analyzing the issue of reasonableness *vel non,* the courts have not sought to determine whether a protective inventory was justified by "probable cause." The standard of probable cause is peculiarly related to criminal investigations, not routine, noncriminal procedures.... The probable cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations.

 In view of the noncriminal context of inventory searches, and the inapplicability in such a setting of the requirement of probable cause, courts have held—and quite correctly—that search warrants are not required, linked as the warrant requirement textually is to the probable cause concept. We have frequently observed that the warrant requirement assures that legal inferences and conclusions as to probable causes will be drawn by a neutral magistrate unrelated to the criminal investigative-enforcement process. With respect to noninvestigative police inventories of automobiles lawfully within governmental custody, however, the policies underlying the warrant requirement ... are inapplicable.

 *South Dakota v. Opperman,* 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097–98 n. 5, 49 L.Ed.2d 1000 (1976).

nounced in *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed. 2d 607 (1975), stressed that when inventory searches are conducted in accordance with established police department rules or policy the officer does not make a discretionary, and perhaps arbitrary determination to search. *Id.* 428 U.S. at 383, 96 S.Ct. at 3104. More recently, in *Colorado v. Bertine,* 107 S.Ct. at 744, Justice Blackmun, concurring in a judgment upholding an inventory search, made the same point, writing:

> The underlying rationale for allowing for an inventory exception to the Fourth Amendment warrant rule is that police officers are not vested with discretion to determine the scope of an inventory search. This absence of discretion ensures that inventory searches will not be used as a purposeful and general means of discovering evidence of crime. Thus, it is permissible for police officers to open closed containers in an inventory search only if they are following standard police procedures that mandate the opening of such containers in every impounded vehicle.

*Bertine,* 107 S.Ct. at 744 (Blackmun, J., concurring) (citation omitted). In *Opperman, Lafayette* and *Bertine* there was evidence of pre-existing police practice. No Supreme Court case has ever held an inventory search invalid because of the absence of formalized pre-existing standards. In *Bertine,* however, probably in response to Justice Blackmun's concurring opinion, the opinion of the Court notes:

> We emphasize that, in this case, the trial court found that the police department's procedures mandated the opening of closed containers and the listing of their contents. Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria. See *Lafayette,* 462 U.S. at 648, 103 S.Ct. at 2610; *Opperman,* 428 U.S. at 374–357, 96 S.Ct. at 3099–3100.

*Bertine,* 107 S.Ct. at 742, n. 6. The second quoted sentence is perhaps somewhat of an overstatement since neither the *Lafayette* nor the *Opperman* opinions of the Court refer to the standardized criteria other than descriptively. Be that as it may, we assume for purposes of this case that the Court intended in *Bertine* to adopt explicitly Justice Powell's *Opperman* position that pre-existing standards are constitutionally required. If that is so, the Court must also have intended to adopt Justice Powell's *Camara, Brignoni–Ponce* rationale for the requirement; namely that it is necessary in order to confine police discretion in the selection of targets for inventory searches. With that rationale in mind, we turn to the record before us.

■ We note, first, that Lieutenant Kowalski's uncontradicted testimony establishes that when a vehicle is towed for impoundment a pre-existing policy makes the arresting or investigating officer responsible for an inventory search. The policy applies "[w]henever a vehicle comes to the airport." J.A. 115. Thus the arresting or investigating officer is not vested with discretion. Detective Fox was responsible for impounding the vehicle, and under the pre-existing policy he was also responsible for making an inventory search. Thus Frank's *Bertine* contention is necessarily a narrower one: the absence not of a pre-existing inventory requirement, but the absence of a formalized standard setting forth the scope of such an inventory.

The governmental purposes identified in *Opperman,* and reiterated in *Lafayette* and *Bertine,* suggest that the Court may not have intended to require a pre-existing formalized standard as to the scope of an inventory search, as distinct from the standard as to when and by whom such a search will be made. Those interests are (1) protection of the owner's property from theft; (2) protection of the police against claims for lost or stolen property; and (3) protection of the police from danger. The first two interests suggest that the inventory should list every item of property which could be stolen. When, as here, a zippered hanging bag containing personal property is taken into police custody, no standard for the scope of the inventory other than the listing of every item of

property would satisfy the relevant governmental interests. Black's Law Dictionary defines "inventory" as "a list or schedule of property, containing a designation or description of each specific article." Black's Law Dictionary 740 (5th Ed.1979). Elsewhere the word is likewise defined as "a formal, often descriptive, list of articles, giving the code number, quantity and value of each; catalog." Random House Dictionary of the English Language (2d ed. 1983). Use of the term "inventory" of necessity defines its scope. Certainly the Court did not intend to lay down a constitutional requirement that the police have a written standard for conducting an inventory that merely states the obvious. Such a requirement would add nothing to the protection of privacy interests, for no standard ever would be laid down except that of completeness. Inventory searches by their nature afford the police the opportunity to eliminate expectations of privacy in personal property lawfully in police custody. It seems likely, therefore, that all that *Bertine* requires is a standard as to when inventories should be made. If more is required, Lieutenant Kowalski's testimony, that an inventory is required sufficient to safeguard the property, satisfies that requirement, since it necessarily implies a detailed account, catalog or schedule.

Given Lieutenant Kowalski's uncontradicted testimony that Detective Fox as the investigating officer responsible for the impoundment was acting in accordance with standard departmental practice, we are satisfied that Fox had no discretion. While the discussion of the issue might have been clearer, the trial court found "that the police complied with all written and oral procedures and regulations incidental to such searches." J.A. 223. This finding is consistent with Kowalski's testimony, and obviously was intended to refer to that testimony.

At the reargument on the inventory search issue, Frank's counsel made a somewhat different factual contention, that there is in the Allegheny County Police Department a different standard with respect to the scope of the inventory when it is made by an officer investigating a crime than when it is made of vehicles impounded by other officers. The trial court made no such finding, and our examination of the record does not disclose that the issue was raised in the suppression hearing in a manner which might have alerted the government to explore it further. We conclude that the testimony of Lieutenant Kowalski and Detective Fox, fairly read, does not support Frank's dual standard contention. Both testified that an inventory sufficient to protect the property was required in all cases.

■ Even if we assume, however, contrary to the fact, that Lieutenant Kowalski's testimony did not satisfy the *Bertine* requirement of pre-existing inventory practice, we are confident that in this instance the Supreme Court would hold the requirement to be inapplicable. Neither *Opperman* nor *Lafayette* nor *Bertine* presented the question of an inventory search made following a request for the return of personal property. The danger of arbitrary selection of targets for inventory searches which Justice Powell speaks of in his *Opperman* concurrence and Justice Blackmun speaks of in his *Bertine* concurrence has no relevance to the undisputed facts of this case. On Sunday, November 8, 1987, Frank made a request that his personal belongings be turned over to his family. He was aware that the car was a rental car, and thus that the police would have to identify which property in it belonged to him. Any danger of arbitrary selection of his car for an inventory search was obviated by his request. Assuming the complete absence of pre-existing standards as to when inventory searches should be made, the police would still be required to respond to that request. Only by identifying and listing the contents of the vehicle could they identify Frank's property. Having to respond, they were necessarily confronted with the governmental interests in protecting the property from theft and the police from charges of theft. Indeed when they removed personal property from the vehicle at Frank's request, those interests were implicated to a greater extent than if the property had merely been left in the

locked car. For police departments which do not deem it necessary to make inventory searches routinely, an owner's de facto request for one necessarily forces the adoption of an ad hoc procedure for responding. Having made a request for the return of his property, therefore, Frank is in no position to urge either that his car was searched arbitrarily, or that on November 10 when it was searched he had any expectation of privacy respecting the property in it.

Frank argues that the police had already decided to conduct an inventory search prior to his November 8 request. The fact remains, however, that the search occurred only after Frank had made that request. Evidence may be suppressed only for constitutional violations, not for bad intentions. It is true that the district court made no explicit finding that the inventory search followed the request. The record, however, admits of no other conclusion. Indeed Frank introduced in evidence the record showing he made the request, and premised a line of questioning in cross-examination of Detective Fox on that request. J.A. 834; 146–47. Frank is asking that the district court order denying his suppression motion be reversed. Whether or not the district court made a finding on the sequence of request and search, the undisputed fact that a request antedated the search is a separate ground for affirmance, which we are obliged to note.

■■■■ Once the officer conducting the inventory search observed items which they had probable cause to believe were evidence of the state or federal offenses with which Frank was charged, he could lawfully seize them. See *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Texas v. Brown*, 460 U.S. 730, 735–44, 103 S.Ct. 1535, 1539–44, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971). Frank focuses on the fact that Detective Fox seized a document written in spanish which proved when translated to be a Dominican Republic residency permit. He urges that the fact that it was written in spanish suggests that there was no probable cause to seize it. Without translation, however, the document indicates on its face that it originated in the Dominican Republic, and it was found together with navigational aids. We hold that there was reasonable cause for believing that it and all the other items seized from the car and admitted in evidence could reasonably be believed to be evidence of Frank's flight in violation of section 1073.

The court did not err, therefore, in denying the suppression motion addressed to the materials seized from the rental car.

B

While Frank was away from Allegheny County the county police obtained a search warrant for the residence of his former wife, Barbara Frank. The officers executing the warrant seized letters addressed to various members of Frank's family. The warrant authorized the seizure of evidence that Barbara Frank was hindering Frank's apprehension in violation of 18 Pa.Cons. Stat.Ann., § 5105. Frank moved to suppress the evidence resulting from the execution of this warrant on the ground, as best we can make out from his argument, that because it was evidence of his flight to avoid prosecution, it was beyond the scope of the warrant, and on the further grounds that the search was not based on a proper warrant or probable cause.

■■■■ The district court denied the motion, finding that the affidavit supporting the warrant alleged sufficient facts for probable cause to believe that Barbara Frank or other members of her household had hindered apprehension of a fugitive by concealing knowledge of Frank's whereabouts in violation of 18 Pa.Cons.Stat.Ann., § 5105. Frank does not now dispute the sufficiency of the affidavit. He repeats his contention, however, that although the materials seized are evidence of his unlawful flight, they are not evidence of the Pennsylvania crime of hindering the apprehension of a fugitive, the seizure of which was authorized by the warrant.

We have examined the evidence which he challenges, and we agree with the trial court's implicit finding that it fits the description in the warrant. The letters written by Frank to members of his family during his out-of-state travels, the passport of his daughter Susan showing that she had recently traveled to the Dominican Republic, and photographs taken in a tropical setting all fit within the warrant description of "documents concerning [Frank's] whereabouts" and "document containing information demonstrating that Barbara Frank or other family members knew of his whereabouts." The fact that the evidence also tends to prove Frank's violation of section 1073 is not a ground for suppression. The motion to suppress the evidence seized at Barbara Frank's residence was properly denied.

 Frank argues on appeal for the first time that a United States Marshal participated in the search of Barbara Frank's home, and that the search warrant was not issued in compliance with Fed.R. Crim.P. 41(a). Since this contention was not raised in his suppression motion as a ground for suppression it is waived. Fed. R.Crim.P. 12(b)(3).

### IV

 Frank contends that a judgment of acquittal is required because there is insufficient evidence that he violated section 1073. To prove such a violation the government must prove that the defendant willfully moved or traveled in interstate or foreign commerce with the intent to avoid a state prosecution. The indictment alleges that Frank traveled in interstate commerce between November of 1986 and November 5, 1987, when he was arrested. Frank concedes that there was ample evidence of such travel, but urges that the evidence is insufficient to establish that he did so willfully to avoid prosecution. At this stage of the case we must review the evidence and the inferences to be drawn therefrom in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

There is evidence that on November 7, 1987, Detective Fox told Frank it was possible that criminal charges involving forgery and theft of municipal bonds would be brought against him. Frank asked if there was anything he could do to prove his innocence, and was told to produce the victim. Thereafter, Frank sent several letters to Fox promising to provide evidence of his innocence, but did not do so. A factfinder could reasonably infer that Frank's promises to provide evidence of his innocence were intended to delay his prosecution while he prepared to flee. In the November 7, 1987 conversation there was a discussion about Frank's yacht. There is evidence that he did take his yacht to the Caribbean.

On January 5, 1987, Detective Fox obtained a warrant for Frank's arrest. Fox attempted to locate Frank by interviewing family members, none of whom informed him that Frank was on a yachting vacation. Evidence seized at Barbara Frank's residence shows that she was aware of the warrant. Letters and other evidence show that Frank's daughter Susan visited him in March of 1987 in the Dominican Republic. A February 20, 1987 letter from Frank recounts the rigors of his long voyage, but describes the sensation of freedom. Frank obtained a certificate of residency for the Judicial District of Somana in the Dominican Republic. Frank sailed his yacht to Venezuela, and opened a bank account there depositing $31,000. He then traveled to New York, and on his way disclosed to a fellow traveler his intention to sail around the world. In the fall of 1987, shortly before his arrest, he attempted, in Annapolis, Maryland, to locate a crew to sail with him from Venezuela to Tahiti.

When he returned to Pittsburgh in November of 1987, Frank did not stay with relatives, but at the Viking Motel. There is evidence that his daughter called him there several times. From his decision to stay in a motel, the bank account and yacht in Venezuela, and his communications with his daughter, a factfinder could reasonably infer that he returned temporarily either to say goodbye or to persuade some family members to join him on his further travels.

When he was arrested, Frank's rental car contained a copy of the search warrant which had been executed at Barbara Frank's residence. A factfinder could reasonably infer from this that Frank had kept in touch with his family, and was aware of the state charges pending against him since January. The search warrant disclosed on its face that he was wanted by state authorities.

■ Frank's theory as to the insufficiency of the evidence rests on two legal propositions. The first is that section 1073 applies only if state charges were formally pending when he left Pennsylvania. The second is that he never acquired an obligation to cease traveling until he acquired knowledge of formally pending charges. We reject both propositions.

Most courts which have addressed the issue have concluded that Congress did not intend section 1073 to apply only to flight to avoid formally pending state charges. *See Lupino v. United States,* 268 F.2d 799, 800–02 (8th Cir.), *cert. denied,* 361 U.S. 834, 80 S.Ct. 86, 4 L.Ed.2d 75 (1959); *United States v. Bando,* 244 F.2d 833, 834 (2d Cir.), *cert. denied,* 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957); *Barker v. United States,* 178 F.2d 803 (5th Cir.1949), *cert. denied,* 339 U.S. 968, 70 S.Ct. 985, 94 L.Ed. 1376 (1950). The reasoning of *United States v. Bando* is particularly persuasive:

> An analysis of Sec. 1073 does not support any such narrow and strained construction. The words "to avoid prosecution" mean "to avoid being prosecuted." The statute does not say "to avoid *a pending* prosecution." Nor is the word "charged" used in the first half of Sec. 1073 in relation to the flight "to avoid prosecution"; but is used, quite naturally, in the second half of Sec. 1073 in relation to a flight "to avoid giving testimony." The two are separate crimes. The latter requires some pending criminal proceeding. The former does not. It is sufficient if the fleeing is "subject to prosecution."

244 F.2d at 843 (citation omitted). The *Bando* court reinforced its analysis of the statutory language with the observation that the anti-racketeering purposes of the Act would be frustrated if federal apprehension had to await the filing of a formal state charge. *Id.* This interpretation of section 1073 is in our view unquestionably the correct one, as illustrated by the facts of this case. There is ample evidence that Frank knew, when he left Pennsylvania, that he was subject to prosecution. Moreover, there is ample evidence that he continued his interstate travels long after becoming aware that the threat had become an actuality. Given this awareness throughout his "travels," to remove Frank's case from the coverage of the Act would defeat its purpose. Frank is not entitled to a judgment of acquittal.

## V

Frank's objections to the court's instructions raise essentially the same legal contentions which we have disposed of in Part IV above, that he was entitled to an instruction that a formally pending charge was required before he left Pennsylvania and that knowledge of a formally pending charge is an element of the requisite intent. For the same reasons, we find those objections to be without merit.

## VI

Frank has not preserved his contention that his prosecution was not authorized as required by section 1073, and we cannot reverse on that ground on the basis that it is plain error. Frank's suppression motions were properly denied. There was sufficient evidence of a willful violation to submit the case to the jury. Frank's objections to the court's instructions are meritless. Thus, his conviction must stand.

### THE GOVERNMENT'S APPEAL

As we are upholding Frank's conviction, we must address the government's appeal taken pursuant to 18 U.S.C. § 3742(b)(1). That section, a part of the Sentencing Reform Act of 1984, Ch. II, Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, October 12, 1984, codified at 18 U.S.C. § 3551 *et seq.* and 28 U.S.C. § 991 *et seq.* (1982 & Supp. III 1985) provides that "[t]he

government may file a notice of appeal in the district court for review of an otherwise final sentence if the sentence—(1) was imposed in violation of law...." Frank's conviction was for an offense which continued after November 1, 1987. Thus, he should have been sentenced in accordance with the requirements of the Sentencing Reform Act. Sentencing Act of 1987, Pub. L. No. 100–182, 101 Stat. 1266 § 2(a) (amending 18 U.S.C. § 3551 *et seq.*) The district court, however, sentenced Frank under 18 U.S.C. § 1073 without regard to the sentencing guidelines issued pursuant to the Sentencing Reform Act because, in the court's view, that statute was unconstitutional. The court ruled that the guidelines imposed a mechanical sentencing procedure which deprived Frank of a substantive due process right to have the sentencing court make an individualized determination of an appropriate sentence. The court also ruled that the development of the guidelines by the Sentencing Commission, created in the Sentencing Reform Act, violated principles of separation of powers, and that the whole statute was therefore unconstitutional, 682 F.Supp. 815. Because the district court did not proceed under the Sentencing Reform Act no findings have been made as to what sentence would be imposed under the guidelines. The government contends, however, that if the guidelines are properly applied, Frank will receive a significantly more severe sentence than was imposed.

I

The Sentencing Reform Act of 1984 established the United States Sentencing Commission which is comprised of seven voting members and the Attorney General or his designee as a non-voting ex officio member. The President appoints the voting members, at least three of whom must be federal judges selected from a list recommended by the Judicial Conference of the United States. 28 U.S.C. § 991(a). Federal judges who are appointed may serve without resigning their judicial appointment. 28 U.S.C. § 992(c). Voting members are appointed for six-year terms. 28 U.S.C. § 992(a). The Commission is authorized to promulgate and distribute to all courts of the United States guidelines for use of a sentencing court in determining the sentence to be imposed in a criminal case. 28 U.S.C. § 994(a)(1). The statute instructs the Commission in detail as to how the guidelines should be developed; most importantly, it directs the Commission to create categories of offense behavior and offender characteristics. Judges must select a sentence within a guideline range, unless they find that an aggravating or mitigating circumstance exists that was not adequately taken into account by the Commission in formulating the guidelines. 18 U.S.C. § 3553(b). The Commission has promulgated guidelines, and it is fair to say that they, together with the strictures of the statute, substantially circumscribe the discretion which district judges formerly exercised over sentencing.

Frank urges that we endorse the district court's view that by circumscribing the sentencing court's discretion, Congress has violated substantive due process. In articulating that view the district court relied on the due process balancing analysis of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to conclude that the defendant's interest in liberty, combined with the risk of "unjust or incorrect" judgments resulting from mandatory sentencing, required that the district courts have greater discretion than the Sentencing Reform Act affords because that interest outweighs the government's interest in mandatory sentencing. But while *Mathews v. Eldridge* informs as to what procedural due process is required when a substantial property or liberty interest is affected by government action, it does nothing to identify what substantive liberty or property interests exist. Frank's complaint, like the district court's assumption that erroneous judgments result under the guidelines, goes not to the procedures for determining the appropriate guideline range, but to the substance of the invasion of liberty that results from its application.

 There are substantive limits upon congressional power to specify sentences for federal offenses. The eighth amend-

ment is such a substantive limitation. Moreover, Congress could not without violating due process direct the enhancement of a sentence in retaliation for a successful challenge to a conviction. *North Carolina v. Pearce*, 395 U.S. 711, 723–25, 89 S.Ct. 2072, 2079–80, 23 L.Ed.2d 656 (1969). Additionally, procedural due process protects a defendant from having a sentence imposed based upon significant misinformation. *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591–92, 30 L.Ed.2d 592 (1972). The procedural requirements for determining what sentence should apply, however, are rather minimal. *United States v. Davis*, 710 F.2d 104, 106 (3d Cir.), *cert. denied*, 464 U.S. 1001, 104 S.Ct. 505, 78 L.Ed.2d 695 (1983). Frank does not contend that the guidelines violate the eighth amendment, that they retaliate against him for the exercise of other legally protected rights, or that the method of determining their applicability is procedurally inadequate. Thus, what we are left with is the contention that there is a federal substantive liberty interest in an individualized determination of an appropriate sentence.

When dealing with imposition of the death sentence the Supreme Court has certainly cast doubt upon mandatory sentencing. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 598, 98 S.Ct. 2954, 2961, 57 L.Ed.2d 973 (1978). That result apparently depends upon the proportionality requirement of the eighth amendment, a substantive liberty interest. Only once has the Court extended the proportionality requirement beyond the death sentence area. *See Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (striking down a recidivist statute under which defendant was sentenced to life imprisonment without parole for successive bad checks on the basis of the eighth amendment proportionality requirement); *but see Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (upholding a recidivist statute under which defendant convicted of repeated fraudulent use of credit card was sentenced to life imprisonment with the possibility of parole against eighth amendment challenge). Following suit, courts of appeals have consistently rejected claims that mandatory prison terms set by Congress violate the due process clause by limiting the sentencing judge's discretion. *See, e.g., United States v. Goodface*, 835 F.2d 1233, 1236 (8th Cir.1987) (mandatory five-year sentence is valid), *United States v. Van Horn*, 798 F.2d 1166, 1167–68 (8th Cir.1986) (mandatory consecutive sentence is valid); *United States v. Bridgeman*, 523 F.2d 1099, 1121 (D.C.Cir.1975), *cert. denied*, 425 U.S. 961, 96 S.Ct. 1743, 48 L.Ed.2d 206 (1976) (mandatory minimum sentence is valid). *Smith v. United States*, 284 F.2d 789, 791 (5th Cir.1960) (mandatory fixed and specific sentence is valid). *See generally*, A. Campbell, Law of Sentencing, § 28, at 105–06 & n. 46 (1978). We can conceive of sentencing guidelines imposing sentences short of the death sentence which are so disproportionate that they might be held to be cruel and unusual punishment. That substantive challenge is not advanced by Frank, however, and would in any event appear to be meritless in his case. The guideline sentences are, if anything, a move toward, rather than away from, proportionality in sentencing.

Aside from the proportionality argument, which may involve an eighth amendment substantive liberty interest, what is left is the contention that recognition of individualized treatment in sentencing is a right inherent in the human condition. The Supreme Court has recognized some substantive due process liberty interests as inherent in the human condition. *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (recognizing a woman's qualified right to terminate her pregnancy included in a substantive due process right to privacy); *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (recognizing substantive liberty interest in freedom from civil commitment); *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (recognizing a substantive liberty interest in freedom from the application of excessive physical force). The recognition of a substantive liberty interest in individualized treatment in sentencing would, however, be

inconsistent with the generally accepted notion that both retribution, which focuses on the interests of the victim rather than the status of the defendant, and general deterrence, which focuses on the interests of society at large rather than the status of the defendant, are appropriate societal reasons for imposing sanctions. Therefore, we reject Frank's invitation to affirm the district court's departure from the guidelines on substantive due process grounds.

## II

Frank's separation of powers challenge to the Sentencing Reform Act involves several aspects which require separate treatment.

## A

■ Frank contends that because sentencing is an inherently judicial function, Congress lacked constitutional authority to remove judicial discretion in sentencing. While the pronouncement of sentence after a trial or a guilty plea may be an inherently judicial function, the proposition that specifying the sentence is an inherently judicial function is not supportable either by history or by the text of the Constitution. The Supreme Court has consistently recognized that Congress has plenary authority over the designation of appropriate punishment for federal crimes. *See United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Ex parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916). The early practice was for Congress to prescribe specific punishments for specific crimes, and it was only much later that Congress delegated to the federal courts the broad discretion in sentencing which they have exercised in recent years. *Grayson*, 438 U.S. at 45–46, 98 S.Ct. at 2613. The Supreme Court rejected the proposition that the power over sentencing is inherently judicial when it decided that Congress' delegation of the authority to determine release dates to the Parole Commission validly implied that the judge has no enforceable expectations with respect to the release date, short of the statutory term. *United States v. Addonizio*, 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979). Likewise, this court in *Geraghty v. United States Parole Commission*, 719 F.2d 1199, 1208 (3d Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984), squarely held that the legislation creating the federal parole board was not an impermissible delegation of an inherently judicial function. Thus, we hold that Congress may lawfully curtail judicial discretion in sentencing.

## B

■ Frank's most fundamental challenge to the Sentencing Reform Act is that by directing the Sentencing Commission to make substantive policy decisions, Congress has unlawfully delegated legislative authority which only it can exercise. In considering an unlawful delegation claim this intermediate appellate court is bound by decades of Supreme Court precedent upholding the delegation of rulemaking authority. "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [make rules] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Hampton & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928). *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the sole two instances of the Supreme Court's departure from a generous recognition of congressional power to delegate rulemaking authority, are aberrational. Since 1935, the Court's position has been settled in favor of recognizing expansive congressional authority to delegate rulemaking authority under broad standards. *See, e.g., Lichter v. United States*, 334 U.S. 742, 785–86, 68 S.Ct. 1294, 1316–17, 92 L.Ed. 1694 (1948) (upholding delegation of authority to determine excessive profits); *American Power & Light Co. v. SEC*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946) (upholding delegation of authority to SEC to prevent the unfair or

inequitable distribution of voting power among security holders); *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944) (upholding delegation to administrator to fix commodity prices which will be fair, equitable and effectuate the purposes of the Emergency Price Control Act of 1942); *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 600, 64 S.Ct. 281, 286–87, 88 L.Ed. 333 (1944) (upholding delegation to Federal Power Commission to determine just and reasonable rates); *National Broadcasting Co. v. United States,* 319 U.S. 190, 225–26, 63 S.Ct. 997, 1013–14, 87 L.Ed. 1344 (1943) (upholding delegation of authority to the Federal Communications Commission to regulate broadcast licensing "as public interest, convenience, or necessity" requires). *But see National Cable Television Ass'n v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 1150, 39 L.Ed.2d 370 (1974) (narrowly construing statutory standard governing measure of fees assessed by agency in order to avoid possible delegation problem).

Certainly in the Sentencing Reform Act Congress has provided an abundance of substantive guidance to the Commission. The Act specifies four purposes of sentencing: (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (2) "to afford adequate deterrence to criminal conduct"; (3) "to protect the public from further crimes of the defendant"; and (4) "to provide the defendant with needed ... correctional treatment...." 18 U.S.C. § 3553(a)(2). The Commission must pursue these purposes in formulating sentencing guidelines. 28 U.S. C. § 991(b)(1)(A). The same purposes must be considered by the sentencing court in selecting a sentence within the guideline range. 18 U.S.C. § 3553(a)(2). The Commission is required to issue guidelines that "provide certainty and fairness in meeting the purposes of sentencing," while "avoiding unwarranted sentencing disparities" and "maintaining sufficient flexibility to permit individualized sentences" where appropriate. 28 U.S.C. § 991(b)(1)(B). The guidelines must include:

(A) a determination whether to impose a sentence to probation, a fine, or a term of imprisonment;

(B) a determination as to the appropriate amount of a fine or the appropriate length of a term of probation or a term of imprisonment;

(C) a determination whether a sentence to a term of imprisonment should include a requirement that the defendant be placed on a term of supervised release after imprisonment, and, if so, the appropriate length of such a term; and

(D) a determination whether multiple sentences to terms of imprisonment should be ordered to run concurrently or consecutively;....

28 U.S.C. § 994(a)(1). The Commission must categorize offenses and defendants and establish a sentencing range "for each category of offense involving each category of defendant." 28 U.S.C. § 994(b)(1). That range must be consistent with pertinent provisions of Title 18, and may not vary by more than "25 percent or 6 months" from the minimum to the maximum. 28 U.S.C. § 994(b)(1)(2). Statutory maximums specified in Title 18 may not be exceeded. In establishing offense categories the Commission is directed to take into account seven enumerated factors. 28 U.S. C. § 994(c). The Commission is prohibited from considering the race, sex, national origin, creed, and socioeconomic status of offenders, but is directed to take into account eleven other listed offender factors to the extent that they are relevant. 28 U.S.C. § 994(d). This web of directions from Congress to the Commission is far more specific and intelligible than most of the rulemaking standards involved in previous Supreme Court decisions upholding delegated rulemaking authority.

Frank urges, however, that a stricter standard for delegation is required when the delegated authority may result in the imposition of criminal sanctions. For this proposition he relies on a statement to that effect in Justice Brennan's concurring opinion in *United States v. Robel,* 389 U.S. 258, 275, 88 S.Ct. 419, 429–30, 19 L.Ed.2d 508 (1967). In that respect Justice Brennan

spoke only for himself. The majority of the Court has not shown any inclination, in *Robel* or since, to depart from the holding in *Yakus v. United States*, 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944), which upheld the imposition of a criminal sanction for the violation of an administrative price regulation under the usual delegation test. The Sentencing Reform Act is one step removed from the sort of direct criminalization of conduct by an agency considered in *Robel* and *Yakus*, because it authorizes the Commission only to establish guidelines for the consequences of offender conduct, not to lay down rules for conduct at the primary level of activity. *Cf. Geraghty v. United States Parole Commission*, 719 F.2d 1199, 1213 (3d Cir. 1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984) (noting that parole guidelines do not function as a redrafting of federal criminal statutes as part of rationale for upholding delegation of guideline authority to Parole Commission under the usual delegation test). But in any event, the detailed instructions from Congress to the Commission set forth in the Sentencing Reform Act amply satisfy Justice Brennan's *Robel* test for delegation, should his colleagues choose to adopt it.

We therefore hold that the Sentencing Reform act is not an unlawful delegation of legislative power.

### C

Frank next contends that, assuming congressional authority over sentencing, and assuming that the delegation is sufficiently circumscribed to be otherwise lawful, the delegation in this instance violates separation of powers principles because of the composition and location of the Commission.

The Commission is described in the Sentencing Reform Act as "an independent commission in the judicial branch of the United States." 28 U.S.C. § 991(a). At least three of its members must be federal judges selected from among six recommended by the Judicial Conference of the United States. *Id.* The voting members

are appointed by the President with the advice and consent of the Senate, and are "subject to removal from the Commission by the President only for neglect of duty or malfeasance in office or for other good cause shown." *Id.* Frank's objections to this structural arrangement are numerous, and not necessarily consistent one with another. Before addressing them, we note several separation of powers objections which are not open to him.

Frank makes no contention that the structural arrangements for the Commission violate any of the express textual provisions in the Constitution that deal with separation of powers. *Compare, e.g., Morrison v. Olson*, — U.S. —, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (considering whether appointment of special prosecutor by the judiciary violated appointments clause of article II); *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (considering whether appointments clause was violated by conferring executive functions on official removable by Congress); *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (considering whether the bicameral requirement of art. I, § 1 and § 7, cl. 2 and the presentment clauses, art. I, § 7, cls. 2, 3, were violated by retention of legislative veto over actions of executive branch agency); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (considering whether appointments clause was offended by congressional assumption of power to appoint a majority of members of the Federal Election Commission). No question of judicial or legislative usurpation of the President's removal and appointment powers is raised by the Sentencing Reform Act. Compare, *Morrison, Bowsher* and *Buckley, supra* (all considering whether the President's power under the appointments clause of article II was compromised by another branch). Under the Sentencing Reform Act, appointments are made by the President. The removal provision is as broad as that upheld in other contexts. *See, e.g., Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935) (upholding good cause limitation of President's removal power over members

of an independent commission). Frank does not contend that Congress would violate the appointments clause by specifying the qualifications for an office it creates. Any presentment clause contention is disposed of by our rejection of Frank's unlawful delegation argument.

 Frank is therefore obliged to fall back on non-textual separation of powers tests. Where no specific textual provision of the Constitution is alleged to be violated, legislative action is still subject to scrutiny for a functional violation of the constitutional principle of separation of powers. *See, e.g., Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (*Nixon v. AGS*) (upholding under a functional analysis the presidential Recordings and Materials Preservation Act, directing the Administrator of GSA to take custody of presidential materials, against a separation of powers challenge); *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (*Nixon*) (rejecting under a functional analysis a claim of absolute presidential immunity based on the doctrine of separation of powers). As it has been articulated by the Supreme Court, the analysis of functional, as opposed to textual, alleged violations of the separation of powers doctrine does not "contemplate[ ] complete division of authority between the three branches," but rather adopts a "more pragmatic, flexible approach," associated with Madison (The Federalist No. 47), Mr. Justice Story (Commentaries on the Constitution § 525), and Mr. Justice Jackson (*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)). *Nixon,* 433 U.S. at 442–43, 97 S.Ct. at 2789–90. This pragmatic approach to functional separation of powers violations subjects challenged legislation to three inquiries, asking whether, under the challenged legislation: (1) one branch of government assumes a function more properly entrusted to another (the aggrandizement-of-power test); *see Morrison,* 108 S.Ct. at 2620; *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 856, 106 S.Ct. 3245, 3260–61, 92 L.Ed.2d 675

(1986); *Chadha,* 462 U.S. at 963, 103 S.Ct. at 2790; *Nixon v. AGS,* 433 U.S. at 443, 97 S.Ct. at 2790; *Nixon,* 418 U.S. at 694–96, 94 S.Ct. at 3100, 3101–02; (2) one branch assumes functions that impair the ability of another branch to perform its proper functions and (3) the imposition of functions on one branch impairs that branch's ability to perform its own functions (the impairment tests), *see Morrison,* 108 S.Ct. at 2614; *Schor,* 478 U.S. at 856, 106 S.Ct. at 3260–61; *Chadha,* 462 U.S. at 963, 103 S.Ct. at 2790 (Powell, J., concurring in the judgment); *Nixon v. AGS,* 433 U.S. at 443, 97 S.Ct. at 2790. If the legislation has the potential for aggrandizement or impairment in any of these manners, then it can be justified only "by an overriding need to promote objectives within the constitutional authority of [the acting branch]." *Nixon,* 433 U.S. at 433, 97 S.Ct. at 2790. To put it another way, a potential for impairment of functions requires heightened scrutiny of the question whether the congressional action is "necessary and proper." Art. I, § 8 cl. 18.

 The two features of the Sentencing Reform Act on which Frank and other critics of the legislation focus their attention are found in 28 U.S.C. § 991(a), designating the Commission as "an independent commission in the judicial branch" and requiring that three of its members be federal judges. If any aggrandizement of powers takes place by virtue of these provisions it must be an aggrandizement of the powers of the judicial branch. However, the overall effect of the Act is to decrease the discretion of the judicial branch in performing its core function of imposing judgments —a point Frank himself makes in his "sentencing is a judicial function" due process argument. Housing the Commission in the judicial branch has the effect, as a matter of statutory interpretation, of exempting it from certain statutes which would otherwise apply, *e.g.,* the Freedom of Information Act, 5 U.S.C. § 552; the Privacy Act, 5 U.S.C. § 552a; the Government-in-the-Sunshine Act, 5 U.S.C. § 522b. But because these statutes by their terms do not apply to the judiciary, conferring the same ex-

emptions on the Commission neither adds to nor subtracts from the powers of the judicial branch. The Commission is not authorized to render judgments, and it does not speak for the judiciary as a whole. Its members from the judiciary, when performing their core judicial function aside from their Commission work, have no greater powers than other federal judges. Thus, the Act does not aggrandize the power of the judicial branch.

Frank makes two impairment arguments: (1) that the Sentencing Reform Act impairs the powers of the executive branch; and (2) that it impairs the functioning of the judicial branch. The first argument depends on the following syllogism. The Constitution entrusts the enforcement of the laws to the executive branch; developing sentencing guidelines is enforcement of the laws, ergo, placing the Sentencing Commission in the judicial branch is an unconstitutional impairment of the executive function. The Department of Justice, perhaps with less enthusiasm than before the decision in *Morrison v. Olson,* 108 S.Ct. 2597 (1988), advances the same syllogism, but notes that the constitutional defect (i.e., the judicial usurpation of the executive function of law enforcement via rulemaking) is readily cured either by regarding the Commission as an executive branch agency housed in the judicial branch for essentially housekeeping purposes, or by severing the provision locating the Commission "in the judicial branch" from the rest of the statute. The Commission, as amicus curiae, rejects the syllogism and argues that the statute, as written, does not impair any executive functions.

■ In our view, the impairment of executive branch functions argument is much ado about almost nothing. It does not rest upon any textual provision in the Constitution. It is a functional argument, and when examined functionally it breaks down. The President's appointment and removal powers under the Sentencing Reform Act are essentially no different than with respect to other independent agencies such as the Securities Exchange Commission. Indeed the ex officio membership of the Attorney General or his designee gives the administration in control of the executive branch a role greater than it has in other independent agencies. No one has suggested to us how the President's influence would be increased if the words "in the judicial branch" were removed. More importantly, the minor premise of the syllogism is a dubious one. Delegated authority to develop sentencing guidelines is not inherently executive. The delegation of authority to develop sentencing guidelines, like any delegation of rulemaking authority, is a delegation of legislative power. If that delegation is made to an executive branch agency, its performance becomes, eo nomine, an executive branch function. The fact that delegations of legislative rulemaking authority have in the past been made to executive branch agencies does not, however, convert rulemaking for all purposes into the execution of the laws. Indeed, long before Congress began the practice of delegating rulemaking authority to executive branch agencies, it delegated such authority to the courts. *See* Process Act of 1793, 1 Stat. 335. There are, of course, presentment clause limits upon congressional power to avoid the operation of the President's veto power. Those limitations would apply even to a delegation to an executive branch agency. As we note in rejecting Frank's unlawful delegation argument, however, they have not been exceeded in the Sentencing Reform Act. Therefore, we reject Frank's contention that housing the Sentencing Commission in the judicial branch unconstitutionally impairs the powers of the executive branch.

■ We turn, finally, to Frank's argument that the requirements that the Commission be housed in the judicial branch, and that three members be federal judges, impair the functioning of the judicial branch. Frank, the Justice Department, and the Commission all agree that Congress chose to designate the Commission as a judicial branch agency, and to require participation by federal judges, for the purpose of increasing public confidence in the Commission's work. Thus, Congress may be said to have borrowed some of whatever prestige attaches to the judicial branch.

The legislative history of the Act suggests, as well, that Congress contemplated a strong and informed input from the judiciary in the work of formulating sentencing guidelines. House Report No. 98–1030, 1984 U.S.Code Cong. & Admin.News 3182, 3346. The conclusion that Frank would have us draw from the above is that Congress intended to make rulemaking on sentencing a judicial function. That conclusion simply does not follow from the premises relied upon. The task of imposing sentences remains a judicial function, and the Commission has no role in that task. The task of preparing sentencing guidelines is related to the core functions of the judicial branch only as any agency rulemaking process is related to its subject matter. The rulemaking agency should be informed about its subject matter, if necessary by persons with relevant expertise. Thus, in this case, Congress determined to make use of the sentencing expertise of federal judges by requiring their representation on the guidelines Commission. The Commission is nevertheless "an *independent* commission in the judicial branch." 28 U.S.C. § 991(a) (emphasis added). As such, it is performing the extrajudicial task of delegated substantive rulemaking.

If Congress had conferred the extrajudicial task of substantive rulemaking on the courts as such, the Sentencing Reform Act would present the question whether Congress could lawfully do so. There is, of course, a long history of delegating procedural rulemaking authority and other non-adjudicative responsibilities to the article III courts. *See, e.g., Morrison v. Olson,* — U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) (judicial appointment of special prosecutors upheld); *Young v. United States ex rel Vuitton et Fils S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987) (judicial appointment of prosecutor for contempt upheld); *Sibbach v. Wilson & Co.,* 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941) (Rules Enabling Act of 1934, now codified at 28 U.S.C. § 2072, held to be valid); *Ex Parte Siebold,* 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1879) (judicial appointment of supervisor of election upheld); *Wayman v. Southard,* 23 U.S. (10 Wheat.)

1, 43, 6 L.Ed. 253 (1825) (judicial procedural rulemaking upheld); *In Matter of Certain Complaints Under Investigation,* 783 F.2d 1488 (11th Cir.), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986) (judicial investigation of conduct of judge upheld). Given this history, had Congress decided to impose the task of developing sentencing guidelines on the federal courts as such, a strong argument could be made that such a statute would be valid. The Sentencing Reform Act stops far short of this, however, and thus we need not resolve that issue.

Because the task of formulating guidelines was not imposed on the courts as such, our inquiry is reduced to two questions: (1) Is the congressional action of borrowing the prestige of the judiciary for the Commission's task likely to impair the independent functioning of the courts? (2) Is participation by federal judges in the extrajudicial task of formulating sentencing guidelines inherently inappropriate to the judicial office?

The first question is answered by experience. The independent functioning of the judiciary would be impaired if, by virtue of the participation of federal judges in the Commission's work, there would arise a realistic expectation of undue deference to its handiwork by the rest of the federal judiciary. Thus far, however, in the brief period since November 1, 1987, when the guideline became effective, at least forty federal judges, with typical independence of mind, have rejected application of the guidelines for one reason or another. The fear of erosion of judicial independence is chimerical.

The second question is answered by precedent. Since *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436 (1792), the Supreme Court has consistently held that individual federal judges may lawfully perform extrajudicial functions which could not be imposed on a court as such. *See United States v. Yale Todd* (1794), published in tandem with *United States v. Ferreira,* 54 U.S. (13 How.) 39 (1851); *In re President's Comm'n on Organized Crime, (Scarfo),* 783 F.2d 370, 375 (3d Cir.1986); *see gener-*

*ally* Slonim, *Extrajudicial Service and the Principle of Separation of Powers,* 49 Conn.B.J. 391, 396–401 (1975); Wheeler, *Extrajudicial Activities of the Early Supreme Court,* 1973 S.Ct.Rev. 1213. We recognize that in some cases recusal of one or more judicial members of the Commission might be required. That remote possibility is not a reason for concluding that the Commission's work product cannot be used by hundreds of other federal judges without impairing the functioning of the judiciary.

### III

Because none of the grounds advanced for holding the Sentencing Reform Act unconstitutional are meritorious, the district court erred in sentencing Frank without regard to the guidelines promulgated under it. Because Frank's conviction was proper, the judgment of sentence must be vacated, and the case remanded for resentencing.

HUTCHINSON, Circuit Judge, dissenting:

I agree with the Court that Frank waived his right to challenge the Attorney General's consent to his prosecution for interstate flight. Accordingly, I would not reach the merits of this issue. I respectfully dissent from Part III A of the Court's opinion in which it finds the search of Frank's rented car a legal inventory search and affirms the district court's denial of Frank's motion to suppress materials seized in that search. I believe this question poses an issue of law and our scope of review is plenary. Because I also believe the denial of this motion constituted prejudicial error warranting a new trial, I would not reach the issue of the constitutionality of the federal sentencing guidelines.

An inventory is not an incantation. In the absence of a defined *a priori* policy, an inventory done to protect property for its owner and the police from danger of an owner's false claims of loss or theft cannot be objectively distinguished from a search for evidence of crime.

The Court correctly recites the practical reasons why an inventory of a lawfully impounded car, unlike an investigative search for evidence of crime, does not require probable cause before a police officer makes it. *See South Dakota v. Opperman,* 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097–98 n. 5, 49 L.Ed.2d 1000 (1976), quoted by the Court in note 1 of its opinion. The problem I see is not whether there are reasons for the inventory exception, but whether the pre-existing policy of the Allegheny County police on inventories was defined to the minimal extent necessary to distinguish a routine inventory from a search for incriminating evidence. I think that *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), requires a policy which sets an inventory apart from a criminal investigation, not one which engulfs it.[1]

In this case we have an unwritten policy that permits the officer charged with investigating the crime to which an impounded car is connected to inventory that car's contents in such detail as he sees fit, when he has time to do it. I do not believe this "policy" is definite enough to draw an objective line between a routine inventory, subject only to general standards of reasonableness, and an investigation for evidence of crime, which requires probable cause.

In reliance on dictionary definitions, the Court first states that an "inventory" is an "inventory" and therefore the policy need not define the scope of an inventory search.

---

**1.** In *Bertine,* Chief Justice Rehnquist wrote for the Court: "We *emphasize* that, in this case, . . . the police department's procedures *mandated the opening of closed containers* and the listing of their contents. Our decisions have *always* adhered to the *requirement* that inventories be conducted according to standardized criteria." *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 742 n. 6, 93 L.Ed.2d 739 (1987) (emphasis supplied). Justice Blackmun, joined by Justices

Powell and O'Connor, concurred and wrote separately "to underscore the importance of having such inventories conducted only pursuant to standardized police procedures." *Id.,* 107 S.Ct. at 744. This requirement is necessary to sufficiently control police discretion in deciding the scope of a search and, in turn, to prevent inventory searches from being used "as a purposeful and general means of discovering evidence of crime." *Id.*

It supports this conclusion with an assertion that insistence on a definite policy as to scope will merely encourage the police to adopt a policy of maximum intrusiveness.

I believe the term "inventory" is neither self-defining nor trapped in synonyms such as "list," "catalog," or "description of each specific article." The articles in a car might be specifically described as "three traveling bags and three briefcases." They may be more specifically described as "three traveling bags and three briefcases, each briefcase containing five manila folders." They might be still more specifically described as "three traveling bags and three briefcases, each containing five folders, marked and identified as follows, the contents of which are described in further detail in Schedule A." The specificity of the assumed inventory might even need further elaboration, as lawyers who inventory household effects in estates of various kinds know all too well when disputes arise among beneficiaries.

Inventories are more or less specific depending on their purpose. If a locked bag in the locked trunk of an impounded car is noted as locked as soon as it comes into police possession, is safely stored, tagged, and returned to the owner as such, the police may believe they have reasonably protected the owner's property interest and their own interest in rebutting false claims. They may, of course, wish more secure protection and so provide, as a matter of policy, that a locked bag shall be opened and its contents listed. In either case, they seem to me to meet the *Bertine* standard. They may even decide to require the listing of each file, package, and paper in the locked bag and still arguably meet that standard. At some point, however, practical concerns such as the absence of infinite time and the press of other responsibilities will figure in the definition of the policy. A busy metropolitan police department is neither likely to adopt nor long follow a policy of precisely listing the contents of each locked bag and each document in that bag in the face of strained urban budgets and limited manpower. Accordingly, I do not believe it is self-evident that the requirement of a reasonably pre-cise policy concerning the scope of an inventory search is likely to lead to a policy of maximum intrusion.

The Supreme Court in *Opperman, Bertine,* and *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), teaches us that an inventory policy must have enough precision to distinguish an inventory from a search for evidence of crime. If the stated policy does not objectively permit that distinction, the police will have secured for themselves discretion to search with or without probable cause. I read *Opperman, Bertine,* and *Lafayette* to forbid that discretion.

Like the Court, I would not wish to impose on our district judges the almost impossible task of inquiring into the mixed motives of a police officer who makes an inventory and comes upon evidence of crime, before deciding whether that evidence is admissible. A reasonably precise pre-existing definition of an inventory's permissible scope helps avoid that inquiry.

The need for a policy which objectively and distinctly separates inventories from searches for evidence of crime is pointed up by the facts of this case. The Court approves an unwritten policy to inventory the contents of every impounded car when the scope of the search is defined by the investigating officer, more or less at his convenience. This policy fails to realistically distinguish neutral inventories from searches for criminal evidence. On the present facts, it does not even adequately meet the common sense reasons why vehicular inventories are permitted without warrant or probable cause. Frank's car was impounded on a Thursday. No inventory was taken when it was towed to the impoundment lot. It sat in the lot without any listing of its contents until the next Tuesday when Detective Fox, the *investigating* officer in charge of the state's case against Frank, could conveniently make an inventory. During that time the police made no record to protect either Frank's interest or theirs by recording the property Frank had in the car when the police received it, nor any investigation to determine whether the contents of the car posed any danger.

The policy shown on this record neither distinguishes an inventory from an investigation nor serves the practical reasons for an inventory exception to the requirement of probable cause. Accordingly, I believe it is insufficient to satisfy even *Opperman* let alone *Bertine.*

Alternately, the Court construes Frank's request, made three days after he was taken from his rented car and arrested, that his property left in it be returned to his family as an implied consent to a search of the locked bag. This may prove too much. Every person who has property in a seized vehicle can be presumed to want its return. If the police then hold the property long enough to engender an inquiry about it, they become free to conduct an *ad hoc* inventory for whatever purpose, in whatever detail they wish when that inquiry comes. By itself, I do not believe such a request to return personal property to one's family is a consent to search.

Moreover, the theory of implied consent was raised by the Court, not the parties. The government sought throughout this case to justify the search of Frank's bag solely on the inventory exception to the probable cause requirement. The facts relevant to a consensual search were not developed on this record. We do not know the context of Frank's request, precisely what he said to the police, or what they said to him when he asked for the return of his property. I believe it is wrong to justify this search on a theory the government never raised, the defendant never had a fair chance to rebut, and the suppression court did not have a chance to consider. I have stated my agreement with the Court's determination that Frank waived his right to challenge the Attorney General's consent to this prosecution. I think it equally clear that the government waived reliance on Frank's consent as a justification for the search of his automobile.

I would therefore hold that the denial of Frank's motion to suppress the evidence found in the locked bag in the trunk of his rented car, particularly the damaging application in Spanish for residency in the Dominican Republic, was prejudicial error. I would remand for a new trial excluding that evidence if the government elects a retrial within a reasonable time.