STATE OF NEBRASKA, APPELLEE, V. NANCY S. FILKIN, APPELLANT.

494 N.W.2d 544

Filed January 29, 1993.   No. S-91-408.

Gerard A. Piccolo, Hall County Public Defender, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Pursuant to verdict, the defendant-appellant, Nancy S. Filkin, was adjudged by the district court to be guilty of possessing a controlled substance, methamphetamine, in violation of Neb. Rev. Stat. §§ 28-405(c)(3)[Schedule II] and 28-416 (Reissue 1989). Filkin appealed, claiming the district court erred in (1) receiving evidence obtained following her arrest from a search of the contents of her purse and (2) refusing to direct a verdict in her favor. The Nebraska Court of Appeals reversed the judgment of the district court, and the plaintiff-appellee, State of Nebraska, successfully petitioned for further review. We reverse the judgment of the Nebraska Court of Appeals and remand the cause with the direction that the Nebraska Court of Appeals affirm the judgment of the district court.

Pursuant to a "no-knock" search warrant, officers entered a house where they found four individuals, including Filkin, who did not reside there. Filkin and the other three individuals were arrested and removed from the premises. Sgt. Ronald Ochsner testified that when he placed her under arrest, Filkin was not carrying a purse. However, Deputy Richard McKinny, who transported Filkin to the Hall County jail, testified that Filkin had her purse with her when he transported her to the jail.

Upon arrival at the Hall County jail, McKinny took Filkin to the female booking area, removed her handcuffs, and remained present during the booking process.

McKinny testified that the Hall County booking process involved "a lot of record-keeping questions, health questions, as well as a search of the property brought in by the prisoner." According to McKinny, the standard operating procedure at the Hall County jail was to inventory property "[t]o see that there are no contraband objects, and, also, for an accurate record for when that prisoner is released, so that the prisoner gets everything back that they brought in with them." He also said that the primary purpose of the search was to assure the safety of the officers.

Corrections officer Cynthia Gorman testified that Hall County has a standard operating procedure for booking individuals, including the inventorying of any personal items that the individual might have. The standard operating procedure with regard to a purse, according to Gorman, is to remove all items to ensure that no money or valuables were contained therein. Moreover, if a corrections officer discovers what is or is believed to be an illegal substance, such substance is to be turned over to the arresting officer.

Filkin's closed purse was opened and inventoried by Gorman under the watchful eye of McKinny. In the process, the officers discovered a black film canister, which they opened. The canister was found to contain, among other things, a small self-seal bag holding .05 grams of a white or off-white powder, later determined to be methamphetamine.

Filkin filed a motion which, insofar as is relevant to our review, sought to suppress the fruits of the search of the film canister, contending that the search violated U.S. Const. amend. IV and Neb. Const. art. I, § 7. The district court overruled Filkin's suppression motion, finding that the search of Filkin's purse was pursuant to standard booking policy and was proper. Defense counsel properly renewed his objection to the search at trial.

By finding that the search of the purse was conducted pursuant to standard booking policy, the district court necessarily found by implication that the search was not one conducted incident to the arrest—quite understandably so, given Ochsner's testimony that Filkin did not have the purse in her possession when she was arrested and the sketchy facts of record as to how the purse came to be in Filkin's possession while she was being transported to the Hall County jail.

The concern, of course, is that the officers, by bringing the purse with them, could convert a search incident to arrest into an inventory search, thus availing themselves of the somewhat broader search standard applicable to that situation than applies under the search-incident-to-arrest setting. See 2 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 5.5(b) (2d ed. 1987).

Nonetheless, it was quite reasonable for law enforcement

officials to have retrieved Filkin's purse, for the purse and its contents would assist them in positively identifying Filkin. See, e.g., *Illinois v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983) (one of the governmental interests served by inventory searches is identification); *State v. Dixon*, 237 Neb. 630, 467 N.W.2d 397 (1991).

Moreover, the officers had a duty to protect any valuables that might have been contained in the purse. Indeed, repercussions may have resulted had an officer not retrieved Filkin's purse. See, e.g., *State v. Quinn*, 565 S.W.2d 665, 672 (Mo. App. 1978) (if officer had not retrieved bag left on step of porch, "he may well have been subject to criticism or at worst legal action. To wait on the street and 'stand over' the bag until a search warrant could be obtained would be impractical").

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Nebraska's constitutional provision with respect to searches and seizures is virtually identical. Neb. Const. art. I, § 7; *State v. Dixon, supra*.

We have consistently held that inventory searches are permissible after an arrest. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Hill*, 214 Neb. 865, 336 N.W.2d 325 (1983). But under the Fourth Amendment, the propriety of inventory searches is judged by a standard of reasonableness. *Colorado v. Bertine*, 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987); *Illinois v. Lafayette, supra*; *U.S. v. Woolbright*, 831 F.2d 1390 (8th Cir. 1987); *State v. Dixon, supra*. However, such searches must be performed in accordance with standard operating procedures.

The first case in which the U.S. Supreme Court implicitly relied upon a police regulation was *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976). In *Opperman*, the defendant's automobile was towed to a city impound lot after it received two parking tickets while

parked in the same location for approximately 7 hours. A police officer inventoried the contents of the vehicle, discovering marijuana in the unlocked glove compartment. The *Opperman* Court, finding the search to be constitutional, held that such intrusions were consistently upheld "where the process is aimed at securing or protecting the car and its contents." 428 U.S. at 373. Noteworthy is that the search in *Opperman* "was limited to an inventory of the unoccupied automobile and was conducted strictly in accord with the regulations of the Vermillion Police Department." 428 U.S. at 380 (Powell, J., concurrence). However, the *Opperman* Court did not discuss whether the regulations were written or oral, nor did it mention whether the regulations were of a formal or informal nature.

Six years later, in *Illinois v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983), on facts mirroring those in the present case, the U.S. Supreme Court held it to be reasonable for the police to search the personal effects of a person under lawful arrest as part of the routine procedure incident to booking and jailing the suspect. In *Lafayette*, the defendant was arrested for disturbing the peace and was taken to the police station. The defendant carried a purse-type shoulder bag on the trip to the station house. Amphetamine pills were subsequently discovered in the bag as police inventoried the contents therein.

The *Lafayette* Court explained the function of the inventory search:

> At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the station house. A *standardized procedure* for making a list or inventory as soon as reasonable after reaching the station house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person. Arrested persons

have also been known to injure themselves—or others—with belts, knives, drugs, or other items on their person while being detained. Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession. . . . Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independently of a particular officer's subjective concerns. . . . Finally, inspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity.

(Emphasis supplied.) 462 U.S. at 646. Accord, *State v. Dixon*, 237 Neb. 630, 467 N.W.2d 397 (1991); *State v. Wallen*, 185 Neb. 44, 173 N.W.2d 372 (1970), *cert. denied* 399 U.S. 912, 90 S. Ct. 2211, 26 L. Ed. 2d 568.

The *Lafayette* Court emphasized that an officer had *testified* that "it was standard procedure to inventory 'everything' in the possession of an arrested person," thus satisfying the standardized procedure requirement. 462 U.S. at 642.

The next U.S. Supreme Court case concerning an inventory search was *Colorado v. Bertine*, 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987). There, the defendant was arrested for driving while under the influence of alcohol. After being taken into custody but prior to the arrival of the tow truck, an officer inventoried the contents of the defendant's vehicle. During the inventory, the officer opened a closed backpack in which he discovered controlled substances, cocaine paraphernalia, and a large amount of cash.

In holding the search to be constitutionally sound, the *Bertine* Court noted that "[i]n the present case, as in *Opperman* and *Lafayette*, there was no showing that the police, who were *following standardized procedures*, acted in bad faith or for the sole purpose of investigation." (Emphasis supplied.) 479 U.S. at 372. The Court concluded that "here, as in *Lafayette*, reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even

though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure." 479 U.S. at 374. Moreover, in a footnote, the Court reiterated that its decisions "have always adhered to the requirement that inventories be conducted according to standardized criteria." 479 U.S. at 374 n.6. Thus, *Colorado v. Bertine* suggests that the applicable regulations must leave police with little discretion as to whether a closed container is to be inventoried.

Finally, in *Florida v. Wells*, 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990), the state highway patrol obtained the defendant's permission to open the trunk of his automobile following his arrest for driving while under the influence of alcohol. The automobile was impounded, and an inventory search revealed two marijuana cigarette butts in the ashtray and a locked suitcase in the trunk. Impoundment facility employees, at the direction of a state trooper, forced open the suitcase and discovered a garbage bag containing a large quantity of marijuana.

The *Wells* Court upheld the lower court's finding that the trial court erred in failing to suppress the evidence of marijuana found in the suitcase.

> Our view that standardized criteria [citing *Bertine*] or established routine [citing *Lafayette*] must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime, [citing *Bertine*]."

495 U.S. at 4.

Because the state Supreme Court found that the state highway patrol had no policy whatsoever with respect to the opening of closed containers encountered during an inventory search, the search did not comport with the demands of the Fourth Amendment. However, the *Wells* Court also stated that inventory searches need not be conducted in a totally

mechanical manner.

Some police discretion remains, however. Dictum in *Wells* states that police "may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." 495 U.S. at 4.

In summary, the holdings of *Opperman*, *Lafayette*, *Bertine*, and *Wells* make clear that an inventory search must be conducted pursuant to standardized policies or established routine. The questions which remain ask what qualifies as "standardized" criteria or "established" routines and how the State must show their existence. But see *State v. Stalder*, 231 Neb. 896, 438 N.W.2d 498 (1989), which in dicta improvidently focuses on the reasonableness of the search of an impounded vehicle rather than on the existence of standardized inventory procedures.

While a written policy is obviously the best means by which to establish the existence of a standardized policy, see Wayne R. LaFave, *Controlling Discretion by Administrative Regulations: The Use, Misuse, and Nonuse of Police Rules and Policies in Fourth Amendment Adjudication*, 89 Mich. L. Rev. 442 (1990), and at least one state has held that such procedures must be in writing to pass muster under the state Constitution, *Commonwealth v. Bishop*, 402 Mass. 449, 523 N.E.2d 779 (1988), such written policy is not an indispensable requirement.

For example, in *U.S. v. Frank*, 864 F.2d 992 (3d Cir. 1988), *cert. denied* 490 U.S. 1095, 109 S. Ct. 2442, 104 L. Ed. 2d 998 (1989), the fact that an officer testified to the existence of standard police procedures and a detective testified that he followed them was held to be sufficient to render an inventory search valid. Noting that "[n]o Supreme Court case has ever held an inventory search invalid because of the absence of formalized pre-existing standards," the U.S. Court of Appeals for the Third Circuit proclaimed that "no standard for the scope of the inventory other than the listing of every item of property would satisfy the relevant governmental interests." 864 F.2d at 1003-04. The court continued, stating that

[c]ertainly the [Supreme] Court did not intend to lay down a constitutional requirement that the police have a written

standard for conducting an inventory that merely states the obvious. Such a requirement would add nothing to the protection of privacy interests, for no standard ever would be laid down except that of completeness. Inventory searches by their nature afford the police the opportunity to eliminate expectations of privacy in personal property lawfully in police custody. It seems likely, therefore, that all that *Bertine* requires is a standard as to *when* inventories should be made.

(Emphasis supplied.) 864 F.2d at 1004. See, also, *U.S. v. Kornegay*, 885 F.2d 713 (10th Cir. 1989), *cert. denied* 495 U.S. 935, 110 S. Ct. 2179, 109 L. Ed. 2d 508 (1990) (officer testimony of customary and standardized procedure held sufficient in absence of written guidelines); *Madison v. United States*, 512 A.2d 279 (D.C. App. 1986) (although capitol police did not have written guidelines, fact that officer testified he had been trained by his supervisors and conducted search in accordance with such training held sufficient); *State v. Weide*, 155 Wis. 2d 537, 549, 455 N.W.2d 899, 905 (1990) ("[a]lthough it may be preferable, there is no rule of law that the policy or procedure governing the inventory search must be in writing"). Cf. *People v. Bayles*, 76 Ill. App. 3d 843, 846-47, 395 N.E.2d 663, 666 (1979), *aff'd* 82 Ill. 2d 128, 411 N.E.2d 1346 (1980), *cert. denied* 453 U.S. 923, 101 S. Ct. 3160, 69 L. Ed. 2d 1005 (1981) (officer testified that he had " 'nothing on paper' " concerning his inventory policy, replied that he " 'really couldn't tell you whether I have or not, it's a possibility' " to whether he instructed his deputies to open closed containers, and that it was his practice to open and inventory a closed container " 'if it's not locked' ").

Thus, there is no constitutional requirement that inventory policies be established in writing.

However, the State bears the burden of proving that a law enforcement agency's search was made pursuant to a standardized criteria or established routine required by the Fourth Amendment. *U.S. v. Judge*, 846 F.2d 274 (5th Cir. 1988). A failure of proof on the State's behalf requires a finding that the search suffered from constitutional infirmities. See, also, *People v. Dandrea*, 736 P.2d 1211 (Colo. 1987); *Matter of*

*B. K. C.*, 413 A.2d 894 (D.C. App. 1980).

While the evidence as to the standards used by the Hall County officials is sparse, the record does, through the testimony of McKinny and Gorman, establish the existence of a standard procedure and that the search was conducted in accordance with that procedure. Although not expressly stated, the clear inference from that testimony is that the film canister was opened in accordance with that standardized procedure.

Arguably, Gorman may have been derelict in her duties had she not searched the purse and its contents. As appellate review is by its nature done in hindsight, it is appropriate to remind ourselves that

> [w]e are hardly in a position to second-guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the station house. It is evident that a station-house search of every item carried on or by a person who has lawfully been taken into custody by the police will amply serve the important and legitimate governmental interests involved.

*Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983).

The foregoing determination that the items found upon the search of the purse were properly received in evidence dooms to failure Filkin's claim that the district court erred in not directing a verdict in her favor pursuant to her motion at the close of all the evidence. The applicable rule is that in a criminal case a court can direct a verdict only where there is a complete failure of evidence to establish an essential element of the crime charged, or the evidence is so doubtful in character, lacking in probative value, that a guilty finding cannot be supported by the evidence. *State v. Hernandez, ante* p. 78, 493 N.W.2d 181 (1992); *State v. Valdez*, 236 Neb. 627, 463 N.W.2d 326 (1990).

Section 28-416(3) prohibits the knowing or intentional possession of methamphetamine unless obtained for a lawful purpose as described therein. The evidence, if believed by the jury, establishes that Filkin did indeed possess methamphetamine, and the circumstances warrant an inference that she

did so knowingly or intentionally. The record is devoid of any suggestion that she possessed it for any lawful purpose. Thus, the district court properly overruled Filkin's motion for a directed verdict.

Accordingly, as noted in the first paragraph of this opinion, the judgment of the Nebraska Court of Appeals is reversed and the cause remanded with the direction that the Nebraska Court of Appeals affirm the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTION.