IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MANKA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TYLER K. MANKA, APPELLANT.

Filed May 2, 2023.    No. A-22-437.

Appeal from the District Court for Hall County: ANDREW C. BUTLER, Judge. Affirmed.

Matthew J. McDonald, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

PIRTLE, Chief Judge, and RIEDMANN and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Tyler K. Manka was convicted by a jury of 10 separate criminal charges related to a shooting which occurred in Grand Island, Nebraska, in July 2021. The district court subsequently sentenced Manka to a total of 60 to 90 years' imprisonment. Manka appeals from his convictions and sentences here. On appeal, Manka challenges the sufficiency of the evidence to support his conviction for first degree assault. He also asserts that the district court erred in failing to sever some of the charges from the others; in admitting evidence that he possessed a controlled substance at the time of the shooting; and in permitting him to wear visible shackles when the jury's verdict was read in open court. Manka also alleges that the district court imposed excessive sentences. Upon our review, we affirm Manka's convictions and sentences.

## II. BACKGROUND

On March 21, 2022, the State filed an amended information charging Manka with 17 counts: attempted murder in the second degree, a Class II felony, pursuant to Neb. Rev. Stat. § 28-201 (Cum. Supp. 2022) and Neb. Rev. Stat. § 28-304 (Reissue 2016); first degree assault, a Class II felony, pursuant to Neb. Rev. Stat. § 28-308 (Reissue 2016); two counts of attempted second degree assault, each a Class IV felony, pursuant to Neb. Rev. Stat. § 28-309 (Reissue 2016) and § 28-201; four counts of use of a deadly weapon to commit a felony, each a Class IC felony, pursuant to Neb. Rev. Stat. § 28-1205(1) (Reissue 2016); one count of possession of a deadly weapon by a prohibited person (a firearm), a Class ID felony, pursuant to Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2022); one count of possession of a deadly weapon by a prohibited person (a knife), a Class III felony, pursuant to § 28-1206; unlawful discharge of a firearm, a Class ID felony, pursuant to Neb. Rev. Stat. § 28-1212.02 (Reissue 2016); criminal mischief, a Class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-519(3) (Reissue 2016); tampering with physical evidence, a Class IV felony, pursuant to Neb. Rev. Stat. § 28-922 (Cum. Supp. 2022); resisting arrest, a Class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-904 (Reissue 2016); obstructing a police officer, a Class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-906 (Reissue 2016); first degree criminal trespass, a Class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-520 (Reissue 2016); and possession of a controlled substance, a Class IV felony, pursuant to Neb. Rev. Stat. § 28-416(3) (Cum. Supp. 2022). The information also alleged that Manka was a habitual criminal pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 2016).

The charges against Manka stem from an incident which occurred on July 10, 2021. Evidence adduced at trial revealed that during the early evening hours of July 10, Manka was walking near Broadwell Street in Grand Island, when he walked past the home of Lucas Galusha. Galusha was familiar with Manka because the night before, Galusha had picked up his friend, Dustin Workman, from Manka's mother's home. When Galusha arrived at the home, Workman and Manka were arguing. Workman hit Manka and Manka pulled out a gun. When Galusha saw the gun, he hurried Workman into his car. Workman did tell Manka that he would be back.

When Manka walked past Galusha's house on July 10, 2021, Galusha followed Manka to a nearby gas station. During the walk, Galusha and Manka "exchanged words." When Manka went into the gas station to buy food, Galusha telephoned Workman to inform him of Manka's whereabouts. At that time, Workman was with his nephew, Pedro Hernandez. Hernandez drove Workman to the gas station in his Dodge Charger. Galusha got into the Charger and indicated that he wanted "to go beat [Manka]'s ass." By this time, Manka had left the gas station, so Hernandez drove around looking for him. They located Manka walking down the sidewalk on Broadwell Street. Galusha got out of the car and walked toward Manka. As he walked behind Manka, Galusha called Manka names, threatened him, and stated that he wanted to fight. Initially, Manka just kept walking down the sidewalk without responding to Galusha other than to occasionally look back at him. Eventually, Manka moved into Broadwell Street and kept walking. Galusha followed him into the middle of the street. Hernandez and Workman were in the Dodge Charger on Broadwell Street, slowly following Manka and Galusha. Galusha initiated a physical confrontation with Manka in Broadwell Street. In response, Manka took out a gun and fired at Galusha and in the direction of the Charger. One gunshot struck Galusha in the abdomen and others struck the front

of the Dodge Charger in multiple locations. After the shooting, Manka ran from the scene. Hernandez stayed at the scene to render aid to Galusha. Workman also fled the scene.

After receiving reports of the shooting and of Manka's involvement, law enforcement began looking for Manka in the surrounding neighborhood. This neighborhood included the residence of Manka's mother. When officers went to her residence, they encountered Manka entering the front yard of the residence from the back yard. Officers pulled their service weapons on Manka and ordered him to get on the ground. Manka did not comply and, instead, ran from the officers jumping over a fence and using back yards and alleyways to get away. In the back yard of Manka's mother's residence, law enforcement located some of the clothing and a back pack Manka had been wearing at the time of the shooting.

Ultimately, officers discovered that Manka had entered an unlocked, detached garage at a nearby residence and locked himself inside. A key for the garage was obtained from the owners of the residence. However, when officers attempted to unlock the garage door, it was relocked immediately from the inside. When officers were finally able to open the garage door using a ram, they observed Manka inside with a knife to his throat. Manka would not drop the knife or come out of the garage despite the commands of law enforcement. Over the next few hours, officers attempted to negotiate with Manka and then deployed a K-9 officer, taser guns, pepper ball canisters, and gas canisters in order to force Manka out of the garage. Manka refused to come out of the garage on his own volition, so tactical officers entered the garage and forcibly restrained and arrested Manka.

After Manka's arrest, he was transported to a local emergency room for evaluation. At that time, the clothing he was wearing, including black shorts and a grey tank top, was confiscated from him and taken into evidence. This clothing was wet from both the chemical agents the officers had deployed in their attempts to remove Manka from the garage and from a decontamination shower Manka had taken at the hospital. Before evidence technicians could store the clothing in evidence, it had to be dried in a drying chamber. Once it was dry, an evidence technician documented, processed, and prepared the clothing for storage, including searching the pockets of the shorts. Inside one of the pockets of Manka's shorts, two baggies containing a white crystalline substance were located. Testing of the white crystalline substance revealed it was methamphetamine.

When officers arrested Manka, they did not locate the gun used in the shooting. A thorough search of the area near the shooting and on Manka's path through the neighborhood was conducted, but the gun was never located. Further evidence presented at trial will be discussed, as necessary, in our analysis below.

After the State rested its case, it moved to dismiss count eight of the amended information, which alleged that Manka had committed criminal mischief. The court granted the State's motion and dismissed the criminal mischief charge. Manka rested without testifying or presenting additional evidence. The jury was instructed regarding the remaining 16 charges. After deliberations, the jury found Manka not guilty of 6 charges and guilty of the 10 remaining charges alleged in the amended information. Specifically, the jury found Manka not guilty of attempted murder in the second degree as to Galusha and the associated use of a deadly weapon charge; attempted second degree assault of Hernandez and the associated use of a deadly weapon charge; and attempted second degree assault of Workman and the associated use of a deadly weapon

charge. The jury found Manka guilty of first degree assault of Galusha and the associated use of a deadly weapon to commit a felony charge; both counts of possession of a deadly weapon by a prohibited person; unlawful discharge of a firearm; tampering with physical evidence; resisting arrest; obstructing a peace officer; first degree criminal trespass; and possession of a controlled substance.

At a subsequent sentencing hearing, the district court found Manka to be a habitual criminal pursuant to § 29-2221, in that he had been at least twice convicted of a felony in Nebraska and had been sentenced to at least one year in prison for each of those convictions. The district court informed Manka that as a result of his habitual criminal status, each of his felony convictions were subject to punishment of at least 10 to 60 years' imprisonment.

The district court sentenced Manka to a total of 60 to 90 years' imprisonment for his convictions. On his conviction for first degree assault, Manka was sentenced to 30 to 40 years' imprisonment. He was sentenced to a consecutive sentence of 20 to 30 years' imprisonment for his use of a deadly weapon conviction. He was sentenced to 10 to 20 years' imprisonment on his conviction for possession of a deadly weapon (a firearm) by a prohibited person and on his conviction for unlawful discharge of a firearm. These two sentences were to be served concurrently with one another and with Manka's sentence for second degree assault. On each of his convictions for possession of a deadly weapon (a knife) by a prohibited person; tampering with evidence; and possession of a controlled substance, Manka received a sentence of 10 to 20 years' imprisonment. On each of his convictions for resisting arrest; obstructing a peace officer; and first degree criminal trespass, Manka received a sentence of 11 to 12 months' imprisonment. These six sentences were ordered to run concurrently with each other, but consecutively to Manka's sentence for first degree assault and use of a deadly weapon.

Manka appeals from his convictions and sentences here.

## III. ASSIGNMENTS OF ERROR

On appeal, Manka assigns and argues five errors, which we consolidate and renumber for our review. First, Manka argues that the district court erred in failing to grant his motion to sever the two counts of possession of a deadly weapon by a prohibited person and the one count of possession of a controlled substance from the other charges. Second, Manka asserts that the district court erred in admitting evidence that he possessed a controlled substance at the time of the shooting, as such evidence was obtained through an illegal search. Third, Manka asserts that there was insufficient evidence to support the jury's verdict finding him guilty of the first degree assault of Galusha. Fourth, Manka argues that it was prejudicial error to allow the jury to see him wearing shackles at the time its verdict was rendered in open court. Finally, Manka argues that the court imposed an excessive sentence.

## IV. ANALYSIS

### 1. SEVERING OF CHARGES

Prior to trial, Manka filed two motions to sever. The district court denied both motions, and Manka appeals those denials here. We address each motion to sever separately.

(a) Standard of Review

A trial court's denial of a motion to sever will not be disturbed on appeal absent an abuse of discretion. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

(b) Motion to Sever Charges Related to Shooting
From Charges Related to Resisting Arrest

The first motion to sever filed by Manka prior to trial asked the district court to sever counts VI, possession of a deadly weapon by a prohibited person, to wit: a knife, count X – resisting arrest, count XI – Obstructing a Peace Officer, Count XII – Criminal Trespass, and count XIII, possession of a controlled substance from the remaining counts and order they be tried separately in a different trial.

In support of this motion to sever, Manka argued that "possessing a knife and [the related] misdemeanor charges are completely separate and apart from the other offenses and occurred at a different location than where the shooting occurred and would be prejudicial if tried together with the other offenses." He further argued that the count relating to possessing methamphetamine should be severed "there being no evidence the methamphetamine has anything to do with the earlier incident and was found three days after the shooting."

The district court denied this motion to sever. The court found that the circumstances surrounding the shooting and Manka's subsequent arrest were "all part of the same act or transaction, and further, even if considered two separate acts of the shooting and the arrest, both events or acts are part of the same common scheme or plan."

On appeal, Manka only challenges the district court's denial of his motion to sever count XIII, possession of a controlled substance (methamphetamine). He asserts that this charge should have been severed from the remaining charges because his possession of methamphetamine, coupled with Galusha's admitting during his trial testimony that he had used methamphetamine in the days leading up to the shooting, would make the jury incorrectly speculate that the shooting had to do with "a drug deal gone bad." Brief for appellant at 28. Manka argues that such an assumption by the jury was prejudicial to his self-defense claim.

Upon our review, we conclude that Manka is raising a new argument on appeal that was not raised to the court below. During the hearing on Manka's motions to sever, he asserted that the charges related to the shooting should be severed from the charges related to his resisting arrest because the two incidents were separate and distinct. On appeal, he has changed his argument to assert that the possession of a controlled substance charge should be severed from the other charges because of certain assumptions the jurors might have made regarding Galusha's use of methamphetamine that could be prejudicial to him. Because Manka did not raise this assertion to the district court, it cannot now be raised for the first time in this court. See *State v. Albrecht*, 18 Neb. App. 402, 790 N.W.2d 1 (2010). The trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *Id*. We do not address Manka's assertion regarding severing the charge of possession of a controlled substance further.

The second motion to sever filed by Manka prior to trial requested that the district court sever count V, possession of a firearm by a prohibited person, in addition to the counts related to Manka resisting arrest, from the counts related to the shooting. Essentially, Manka did not want the jury to learn that he was a convicted felon, believing this would prejudice the jury against him, particularly where he was raising a claim of self-defense as to the shooting of Galusha. Manka believed that if he chose not to testify during the trial, the only way the jury would learn of his status as a convicted felon would be as a result of the two charges for possession of a deadly weapon by a prohibited person (both the firearm and the knife). The district court denied Manka's motion to sever. The court explained:

> [Manka] still has the option and ability to argue self-defense. The jurors will be provided instructions of the law and what to consider and are presumed to follow the duty of the jury, and Mr. Manka still has the right to remain silent. That right is never removed. The State of Nebraska has the burden of proof beyond a reasonable doubt at trial on all of the charges. Mr. Manka has made assumptions in his argument to sever, but has not met his burden of showing prejudice.

On appeal, Manka challenges the district court's decision to deny his motion to sever. Upon our review, we affirm the decision of the district court.

There is no constitutional right to a separate trial. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020). The joinder and severance of charges is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2016), which provides in part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint or by such joinder of offenses in separate indictments, informations, or complaints for trial together, the court may order an election for separate trials of counts, indictments, informations, or complaints, grant a severance of defendants, or provide whatever other relief justice requires.

Whether offenses were properly joined involves a two-stage analysis: (1) whether the offenses were sufficiently related to be joinable and (2) whether the joinder was prejudicial to the defendant. *State v. Benson, supra*. There is a strong presumption against severing properly joined counts. *Id*. While § 29-2002 presents two separate questions, there is no error under either subsection (1) or (3) if joinder was not prejudicial, and a denial of a motion to sever will be reversed only if clear prejudice and an abuse of discretion are shown. *State v. Benson, supra*. An appellate

court will find an abuse of discretion in the denial of a motion to sever only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice. *Id.*

To determine whether the charges joined for trial are of the same or similar character, an appellate court looks at the underlying factual allegations. *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014). Here, the underlying factual allegations of both counts of possession of a deadly weapon by a prohibited person involve Manka's actions on the evening of July 10, 2021. Manka possessed a gun and used that gun to shoot Galusha in broad daylight on a busy Grand Island street. After shooting Galusha, Manka ran from the scene, evaded police, and eventually hid in a garage where he held a large knife to his neck and threatened to hurt himself. Manka's possession of the knife and the concern that he continued to possess the gun used in the shooting resulted in an hours long standoff with law enforcement. We conclude, as did the district court, that the circumstances surrounding Manka's possession of the gun and the knife are based on the same act or transaction or that the circumstances constituted parts of a common scheme or plan pursuant to § 29-2002(1).

Additionally, Manka has not shown that he was prejudiced by the joinder of the two counts of possession of a deadly weapon by a prohibited person. A defendant opposing joinder of charges has the burden of proving prejudice. *State v. Briggs*, 303 Neb. 352, 929 N.W.2d 65 (2019). To prove prejudice in opposing joinder, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever. *Id.* Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal, a chance that the defendant would have had in a severed trial. Joined charges do not usually result in prejudice if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

Manka cannot show any actual prejudice from the district court's refusal to grant the motion to sever. He argued that he would be prejudiced by the jury's knowledge that he was a convicted felon. However, the jury actually acquitted him of multiple charges, including, attempted second degree murder of Galusha and attempted second degree assault of both Hernandez and Workman. Clearly, the jurors were able to effectively separate the evidence of Manka's status as a convicted felon from the evidence related to each of the other charged offenses. Evidence of Manka's status was simple and distinct from the other evidence presented related to Manka's actions on the evening of July 10, 2021. Because Manka cannot show he was actually prejudiced by the denial of his motion to sever, the district court did not abuse its discretion in denying his motion. This assignment of error fails.

### 2. MOTION TO SUPPRESS EVIDENCE OF POSSESSION OF CONTROLLED SUBSTANCE

#### (a) Additional Background

Prior to trial, Manka filed a motion to suppress the search of his shorts conducted by employees of the Grand Island Police evidence lab days after his arrest because such search was conducted without a warrant. Manka alleged that because the search was not proper, that the evidence found as a result of that search, methamphetamine, should be suppressed.

A hearing was held on Manka's motion to suppress the methamphetamine found as a result of the search of his shorts. At this hearing, an investigator with the Grand Island Police Department

testified that when Manka was ultimately arrested after the standoff with police, he was wearing black gym shorts and a gray tank top. The investigator transported Manka's clothing to the police department and placed it in an evidence locker.

Addie Voss, an evidence technician employed by the Grand Island Police Department, processed Manka's clothing after it was placed in the evidence locker. Voss testified at the hearing on Manka's motion to suppress that when she retrieved Manka's shorts from the locker, they were wet. Because items cannot be stored in the property room when they are wet, the shorts were placed in a drying chamber. Voss removed the shorts from the drying chamber and processed them for long-term storage. As a part of this process, Voss photographed the shorts and examined them, including looking through the pockets. Inside one of the pockets of the shorts, Voss located two baggies, the contents of which tested positive for methamphetamine.

During her testimony, Voss explained that it is routine procedure to search the pockets of clothing items which are going to be placed in long-term storage, except if those clothing items have already been processed and packaged, as is done as part of a sexual assault examination. The search is done to locate something that might be dangerous to the evidence technician, like a syringe or a blade, before further processing and packaging the item. Additionally, such a search ensures that nothing that would be dangerous to the evidence storage area is placed therein, like something flammable or explosive. Voss clarified that she was not searching for anything of evidentiary value to the criminal proceedings. Instead, she was merely following her training to routinely inventory items in the pockets of clothing being prepared for long-term storage. In fact, Voss noted that she also prepared and processed a pair of jeans obtained as a part of these criminal proceedings. She searched the pockets of those jeans and located a dollar and some change, which she inventoried.

Investigator Robert Winton, an evidence and crime scene investigator with the Grand Island Police Department, also testified at the hearing on the motion to suppress. Winton confirmed Voss' testimony that it is "standard operating procedure" and the "best practice" to inventory everything in the pockets of clothing items prior to placing those items in long-term storage. Winton did indicate that there was not necessarily a written policy documenting this standard operating procedure. Winton explained that inventorying of items in the pockets of clothing serves three separate purposes. First, such inventories are for safety reasons. It is important to remove hazardous and dangerous materials from items placed in long-term storage. Second, inventory searches of pockets helps to protect the police department from claims of stolen or misplaced property. Finally, the inventory searches ensure that every item being stored in the property room is stored properly and safely.

After the hearing on Manka's motion to suppress, the district court entered an order overruling the motion. The court found that the Grand Island Police Department does have a procedure for inventorying items found in the pockets of clothing prior to placing that clothing into long-term storage. The court explained, "[The procedure] may not be written down in step-by-step detail, but it still exists" and the rationale for such procedure was protecting the evidence room and its staff, and properly noting all items that come into the evidence room. The court found that Voss followed the procedure when handling Manka's shorts and finding the methamphetamine in the pocket of the shorts.

On appeal, Manka challenges the district court's decision to overrule his motion to suppress. Specifically, Manka asserts, "The State [] did not prove [the search of the pockets of his shorts] qualified as an inventory search since different pieces of evidence are treated differently that come into the evidence room." Brief for appellant at 35. Upon our review, we affirm the decision of the district court to overrule Manka's motion to suppress.

(b) Standard of Review

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the 4th Amendment, an appellate court applies a two-part standard of review. *State v. Briggs*, 308 Neb. 84, 953 N.W.2d 41 (2021). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate 4th Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

(c) Analysis

Both the 4th Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Briggs, supra*. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Id*. The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest. *Id*. In this case, the State relies exclusively on the inventory search exception to justify the warrantless search of Manka's shorts, and we limit our analysis accordingly.

Both the U.S. Supreme Court and the Nebraska Supreme Court have consistently held that postarrest inventory searches are constitutionally permissible and that the propriety of such searches is judged by the 4th Amendment standard of reasonableness. *Id*. Inventory searches are considered reasonable because they serve at least three governmental caretaking functions unrelated to criminal investigation: (1) protecting the owner's property while it remains in police custody, (2) protecting the police against claims that they lost or stole the property, and (3) protecting police from potential danger. *Id*.

It is widely recognized that "inventory searches conducted according to established policy are reasonable." *State v. Nunez*, 299 Neb. 340, 346, 907 N.W.2d 913, 917 (2018). The Supreme Court has explained that the reason for requiring inventory searches to be regulated by standardized criteria is that

> an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime[.]"

*State v. Newman*, 250 Neb. 226, 238, 548 N.W.2d 739, 749 (1996), quoting *Florida v. Wells*, 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990).

The particular procedures for conducting inventory searches are left largely to local law enforcement agencies, but the U.S. Supreme Court has made clear that only "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 374, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987). A reasonable inventory search policy has two key features: it must be designed to produce an inventory and it must limit officer discretion regarding when and what to search. *State v. Briggs*, 308 Neb. 84, 953 N.W.2d 41 (2021).

It is the State's burden to show a search falls within the inventory search exception, and a failure of proof on the State's behalf "requires a finding that the search suffered from constitutional infirmities." *State v. Filkin*, 242 Neb. 276, 284, 494 N.W.2d 544, 550 (1993). The State can generally meet its burden by proving the search was conducted pursuant to reasonable standardized procedures governing inventory searches. *Id*. And while a written policy is recognized as the best means by which to prove the existence and requirements of a standardized procedure, there is no constitutional requirement that inventory procedures must be established in writing. *State v. Briggs, supra*. We have recognized that officer testimony can also "establish the existence of a standard procedure and [show] that the search was conducted in accordance with that procedure." *State v. Filkin*, 242 Neb. at 285, 494 N.W.2d at 550. The State generally meets its burden of showing an inventory search was reasonable when it proves the search was governed by, and conducted in accordance with, standardized procedures. *State v. Briggs, supra*. But in *State v. Nunez, supra*, the Nebraska Supreme Court generally agreed with the Eighth Circuit Court of Appeals that the failure to strictly follow standardized procedures does not automatically render an inventory search unreasonable per se.

Here, the State presented evidence at the hearing on Manka's motion to suppress which demonstrated that the search of the pockets of Manka's shorts prior to the placement of those shorts in long-term storage was pursuant to a standardized procedure utilized by the Grand Island Police Department in its evidence room. Both Voss and Winton explicitly testified that when processing, cataloging, and packaging clothing items for long-term storage it is routine procedure to search the pockets of that clothing. Both Voss and Winton also explained that the purpose of that routine procedure was to protect the owner's property while it remained in police custody, protect the police against claims that they lost or stole the property, and protect police, and other items placed in storage, from potential danger. Voss also testified that when she was searching the pockets of Manka's shorts, she was not looking for items of evidentiary value.

Such evidence meets the State's burden of proving that the search of the pockets of Manka's shorts was the result of a reasonable inventory search governed by a standardized procedure. And, while Winton did indicate that the inventory procedure was not written down, as we explained above, this is not fatal to the State's assertion that an inventory search was conducted. See *State v. Briggs, supra*. Winton's and Voss' testimony sufficiently established both the existence of a standard procedure and that the search of Manka's shorts pockets was conducted in accordance with that procedure.

Manka also argues that unlike the shirt and shorts, the Grand Island police chose to obtain a search warrant before searching his backpack. Since different items were treated differently, Manka contends that the search of the shorts could not be considered a valid inventory search. Manka does not explain why a decision to seek a search warrant for one item would invalidate an

otherwise valid inventory search of another. Our case law does encourage law enforcement to take the additional cautionary step of seeking a search warrant for items they wish to search and seize. However, that encouragement does not mean that evidence discovered in a valid inventory search should be excluded simply because a search warrant could have been sought. Here, law enforcement investigators had reason to believe incriminating evidence might be discovered in the backpack. Thus, they took a cautious approach so as to avoid any of the dangers of suppression related to a warrantless search. Those suspicions did not exist with respect to Manka's shorts. The lack of suspicion does not mean an inventory search cannot be executed. Here Voss, acting pursuant to standard practice, removed all items from the pockets of Manka's shorts. Given that the State demonstrated a valid inventory search of Manka's shorts, the district court did not err in overruling his motion to suppress the methamphetamine found by Voss in the pocket of his shorts. We affirm.

### 3. INSUFFICIENT EVIDENCE FOR FIRST DEGREE ASSAULT CONVICTION

In his brief on appeal, Manka challenges the sufficiency of the evidence to support his conviction for first degree assault. He alleges that the State failed to demonstrate beyond a reasonable doubt that Galusha suffered serious bodily injury as a result of the shooting or that Manka was not acting in self-defense when he shot Galusha. We address each argument in turn.

### (a) Standard of Review

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

### (b) No Serious Bodily Injury

#### (i) Additional Background

During the trial, the State presented evidence to demonstrate the extent of the injuries to Galusha caused by Manka shooting him in the abdomen. Galusha testified that he was in a great deal of pain after being shot. He described how he went in and out of consciousness in the ambulance on the way to the hospital.

Jessica Widga, a registered nurse, who was nearby when the shooting occurred, assisted Galusha prior to the ambulance arriving on the scene. Widga described observing two gunshot wounds to Galusha's abdomen. One of those wounds was just under his belly button and the other was on his right side. Widga also observed that Galusha was in significant pain. Based on her medical knowledge, she was concerned about Galusha's injuries because abdominal wounds "can be serious" and even fatal, as there are multiple organs near the abdominal area. If such organs were hit by a bullet a victim could bleed to death.

The State also called Dr. Tyler Ronnfeldt to testify regarding Galusha's injuries. Ronnfeldt was Galusha's treating physician at the emergency room after the shooting. He explained that

Galusha had two gunshot wounds: one on the right side of his torso by his waistline and the other on the right side of his hip. Ronnfeldt believed that both wounds were caused by one bullet entering and then exiting Galusha's lower abdomen. He was initially concerned due to the location of Galusha's wounds. Ronnfeldt explained that a penetrating wound to the abdomen can be very dangerous due to the number of vital organs and major arteries located in or near the area affected. He opined that if any of the major organs were hit by a bullet, there would be a risk of damage to those organs, resulting in long-term medical issues, or there would be a risk of death. Similarly, if a major artery was struck by a bullet, a person could die of blood loss. Ronnfeldt testified that Galusha was lucky, as none of his organs or major arteries were hit by the bullet shot from Manka's gun. Given the nature of the injury, Galusha suffered relatively minimal bleeding.

On appeal, Manka alleges that the evidence presented by the State did not sufficiently demonstrate that Galusha suffered from a serious bodily injury as a result of the shooting and that, as a result, there was insufficient evidence for the jury to find him guilty of first degree assault. Upon our review of the record, we find sufficient evidence to support the jury's guilty verdict as to the first degree assault charge.

*(ii) Analysis*

Manka was charged with first degree assault pursuant to § 28-308, which provides, "[a] person commits the offense of assault in the first degree if he or she intentionally or knowingly causes serious bodily injury to another person." Serious bodily injury is defined in Neb. Rev. Stat. § 28-109(21) (Reissue 2016) as "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or protracted loss or impairment of the function of any part or organ of the body." The Supreme Court in *State v. Swigart*, 233 Neb. 517, 522, 446 N.W.2d 216, 220 (1989) held, "[I]n reference to first degree assault, assaultive conduct which results in exposure to the specific harms described in § 28-109(20), and not actual infliction of the harms described in the statute, is the gravamen of first degree assault and the criminal conduct proscribed by § 28-308(1)." *Swigart* also refers to *State v. Pribil*, 224 Neb. 28, 395 N.W.2d 543 (1986), in which the court rejected a defendant's argument that it is necessary that the injury cause death, serious permanent disfigurement, or impairment of the function of any part or organ of the body and instead held that it is only necessary that the injury involve a "'substantial risk of producing those results.'" *State v. Swigart* 233 Neb. at 522, 466 N.W.2d at 220.

Ultimately, the determination of whether an injury is a serious bodily injury is a question of fact for the jury. *State v. Ramirez*, 285 Neb. 203, 825 N.W.2d 801 (2013). Here, the evidence presented by the State regarding Galusha's injuries as a result of the shooting supported the jury's implicit determination that Galusha suffered serious bodily injury. Multiple witnesses with medical training testified that any penetrating wound to the abdomen presents a substantial risk of death or protracted loss or impairment of the function of any part or organ of the body. Ronnfeldt, in particular, testified that there are a number of major organs and arteries in or near the abdomen. If one of these organs or arteries had been hit by the bullet from Manka's gun, Galusha could have suffered from life threatening injuries, such as excessive blood loss or loss of function of a major organ. While Galusha was lucky in that neither his organs nor his arteries were struck by the bullet, such luck does not diminish the substantial risk of death or loss of organ function that existed as a

result of the bullet wounds. Contrary to Manka's assertion on appeal, we find sufficient evidence supported the jury's determination that Galusha suffered serious bodily injury as a result of the shooting, and thus, supported the jury's guilty verdict as to the first degree assault charge.

(c) Self-Defense

*(i) Additional Background*

On appeal, Manka further claims that the jury's guilty verdict as to the first degree assault charge was not supported by the evidence because, based upon the evidence presented at trial, the jury should have concluded that Manka acted in self-defense when shooting at Galusha. During the trial, there was conflicting evidence presented regarding the events precipitating the shooting and regarding whether Manka was acting in self-defense when he pulled out a gun and shot Galusha.

The evidence in support of Manka's claim of self-defense included eyewitness accounts that Galusha was following Manka as he walked down the street, screaming and antagonizing him. According to these witnesses, Galusha was telling Manka, "you better never point a gun at me like that again. I know where your mama lives. I know where you live. I know where your baby lives." Galusha was also "smacking his hands" together as he yelled and generally seemed very angry at Manka. For a while, Manka was not reacting to Galusha following him or to Galusha's threatening statements. One eyewitness believed that either Workman or Hernandez got out of the Charger and that together with Galusha, they began hitting Manka. There was some evidence that Manka may have fallen down during the physical altercation and that it was only then that he fired his weapon toward Galusha. One witness, who was observing the confrontation through his rear view mirror, even suggested that the Charger attempted to run over Manka immediately after he fired the first gunshot.

The evidence contrary to Manka's claim of self-defense included evidence that Manka could have easily outran Galusha, who was much larger and slower. In addition, Manka had opportunity to escape Galusha when he entered the gas station. Galusha testified that he confronted Manka before Manka entered. Surveillance footage from the gas station shows Manka casually purchasing items, including food and lottery tickets, before exiting the gas station and continuing to walk down Broadwell Street. The surveillance footage does not appear to show Manka asking for help or calling law enforcement.

Additionally, more than one eyewitness testified that Galusha was the only person fighting with Manka prior to the shooting. None of the eyewitnesses saw Galusha with any sort of weapon. Galusha testified that while he did throw a punch at Manka prior to Manka shooting him, he did not actually make contact with Manka, as Manka dodged the punch. Galusha and another eyewitness indicated that Manka never fell to the ground during the altercation. As soon as Galusha swung at Manka, Manka "stood back and fired . . . five times." Galusha testified that he was hit by a bullet as he was trying to run away from Manka. Finally, the State presented evidence that Manka fled from the scene immediately after the shooting, evaded police, and participated in an hours-long standoff with police, rather than staying at the scene and asserting his claim of self-defense.

*(ii) Analysis*

Self-defense is a statutorily defined affirmative defense in Nebraska. *State v. Smith*, 284 Neb. 636, 822 N.W.2d 401 (2012). Neb. Rev. Stat. § 28-1409(1) (Reissue 2016) provides in relevant part that "the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." The Supreme Court has interpreted § 28-1409 to mean that in order to successfully assert the claim of self-defense, a defendant must have a reasonable and good faith belief in the necessity of using force and the force used in defense must be immediately necessary and justified under the circumstances. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

Applying the law set forth above to the evidence in this case, we determine that there was evidence from which the jury could decide that Manka was not acting in self-defense when he shot Galusha. Such evidence includes Manka's opportunity to get away from Galusha, testimony that Galusha did not actually make physical contact with Manka prior to Manka firing shots at Galusha, and testimony that Galusha did not have any weapons during the altercation and that he was attempting to run away when he was struck by a gunshot. Finally, evidence that Manka fled the scene of the shooting and evaded police indicates a consciousness of guilt rather than a reasonable claim of self-defense.

Notably, there was conflicting evidence presented regarding the circumstances surrounding the shooting and Manka's claim of self-defense. However, as we stated above, in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). Based on the evidence presented at trial, we conclude that the jury could have reasonably found that Manka was not shooting at Galusha in self-defense, and that he was guilty of first degree assault.

4. WEARING SHACKLES AT TIME VERDICT WAS RENDERED

(a) Additional Background

Prior to the trial, Manka filed a motion asking the district court to prohibit the use of shackles when Manka appeared in front of the jury. The district court granted Manka's motion and Manka did not appear in shackles during the evidentiary portion of the jury trial. However, after the jury began its deliberations, Manka's defense counsel was notified by the Department of Corrections that Manka would be wearing "restraints in front of the jury when the verdict is announced." Manka objected to the use of visible restraints prior to the verdict being orally rendered, arguing that the jury observing him in restraints might affect the jury during the polling: "that may affect their affirming or not saying if they believe the verdict is appropriate." The district court overruled Manka's objection.

On appeal, Manka challenges the district court's decision to overrule his objection to wearing visible restraints at the time the jury rendered its verdict. Manka alleges that the district court's decision "was prejudicial and violated [his] right to the presumption of innocence and []

due process under the 5th and 14th Amendments of the U.S. Constitution." Brief for appellant at 38. Upon our review, we conclude that Manka cannot demonstrate he was prejudiced by the use of shackles at the time the jury rendered its verdict.

(b) Analysis

The general rule is that a defendant should be free from shackles unless they are necessary to prevent violence or escape. *State v. Heathman*, 224 Neb. 19, 395 N.W.2d 538 (1986). Such rule was originally applied to the guilt phase of criminal proceedings, but has been extended to penalty proceedings in capital cases where a jury is making determinations which will result in the defendant's life or death. *Deck v. Missouri*, 544 U.S. 622, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005). The prohibition against shackles relies on a defendant's central right to a fair trial, guaranteed by the 6th and 14th Amendments, that one accused of a crime is entitled to have his or her guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. *Holbrook v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).

> This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

*Id.* at 567-68. Certain practices, however, pose such a threat to the fairness of the factfinding process that they must be subjected to close judicial scrutiny. *Id.*

In his brief on appeal, Manka does not cite to any authority for the specific proposition that the use of shackles at the time the jury renders its verdict in open court is necessarily prohibited. Upon our review, we have also found no such authority. To the contrary, in *State v. Floyd*, 272 Neb. 898, 725 N.W.2d 817 (2007), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007), and *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010), the Supreme Court found no prejudice where the defendant appeared before the jury in shackles at the time when the jury's verdicts were rendered and the jury was polled, even though the jury was directed to continue its deliberations after that point when one juror waivered as to their decision during the polling process.

In this case, we can find no prejudicial error in the district court's decision to effectively permit Manka to be in shackles at the time when the jury rendered its verdict in open court. By the time Manka appeared before the jury wearing visible restraints, the jury had reached its verdict as to all counts and had committed those verdicts to paper. The jury had found Manka guilty of ten

separate criminal charges, seven of those being felonies. As such, Manka appearing in shackles in front of the jury by that time in the proceedings could not have affected the jury's understanding of Manka's presumption of innocence or of the jury's ultimate decision of his guilt. Manka does not articulate exactly how the polling of the jury was, or could have been, affected by his wearing of shackles. This is especially true here, given the jury's decision to acquit Manka of six criminal charges. We find no error in the district court's decision to overrule Manka's objection to appearing in shackles at the time the jury rendered its verdict.

### 5. EXCESSIVE SENTENCE

### (a) Additional Background

After the verdict was rendered by the jury, the district court ordered Manka to participate in a presentence investigation (PSI). He did not fully comply with the district court's order, refusing to participate in a telephone interview with the probation office and only providing the following written statement, "I have mental illnesses, I was acting in self-defense and was over charged with everything that has to do with this case, I have sciziphrinia [sic], depression, and many illnesses." The probation office relied on a previous PSI completed in November 2019 in assisting the district court with its sentencing determination.

At the time of the current sentencing hearing, Manka was 27 years old. Prior to his arrest, he lived with his mother. Manka has an extremely lengthy and significant criminal history dating back to 2013. In the ten years since 2013, he has been convicted of six felony offenses, including, delivery, dispensing, distributing, manufacturing, or possessing a controlled substance (sentenced to two to four years' imprisonment); terroristic threats (sentenced to three years' imprisonment and 18 months of post-release supervision); first degree false imprisonment (sentenced to three years' imprisonment and 18 months of post-release supervision); failure to stop and render aid (sentenced to three years' imprisonment and 18 months of post-release supervision); assault by a confined person (sentenced to 18 months' imprisonment and 12 months post-release supervision); and attempt of a Class III or IIIA felony (sentenced to 18 months' imprisonment). Each time Manka was released from prison on post-release supervision, such supervision was revoked and Manka was required to be incarcerated for the remainder of the period of post-release supervision.

Since 2013, Manka has also been convicted of 13 misdemeanor offenses, including, theft by shoplifting (two times); theft by unlawful taking; third degree domestic assault; operating a motor vehicle to avoid arrest; driving during suspension; willful reckless driving; third degree assault (two times); carrying a concealed weapon (two times); first degree criminal trespass; and obstructing a police officer. In addition to his criminal offenses, two domestic abuse protection orders have been entered against Manka.

Testing conducted by the probation office in 2019 revealed that Manka posed a very high risk of re-offense.

Prior to imposing Manka's sentences, the district court indicated it had reviewed the PSI and had considered Manka's age, mentality, education, social and cultural background, criminal history, and the nature and motivation for the current offenses. In particular, the court noted that it understood that Manka suffered from mental illness. The court also pointed to the evidence presented at trial which indicated that Manka was not acting in self-defense during the shooting and that he put a number of law enforcement officers in danger by resisting arrest.

On appeal, Manka contends that the district court imposed excessive sentences considering the circumstances surrounding his offenses and current situation.

### (b) Standard of Review

A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id*.

### (c) Analysis

The first step in analyzing whether sentences are excessive is to examine the statutory limits for each offense. *State v. Starks*, 308 Neb. 527, 955 N.W.2d 313 (2021). An appellate court will not disturb a sentence imposed within the statutory limits unless the trial court abused its discretion. *State v. Wilkinson*, 293 Neb. 876, 881 N.W.2d 850 (2016). On appeal, Manka cannot and does not dispute that any of his sentences were not within the statutory limits, even considering Manka's status as a habitual criminal.

Because each of the sentences is within statutory limits, we review the district court's sentences for an abuse of discretion. In reviewing whether an abuse of discretion occurred during sentencing, an appellate court determines whether the sentencing court considered and applied the relevant factors and any applicable legal principles in determining the sentence to be imposed. *State v. Starks, supra*. Relevant factors in that analysis may include the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment that includes the sentencing judge's observation of the defendant's demeanor and attitude and all of the facts and circumstances surrounding the defendant's life. *Id*.

There is no indication in the record that the district court failed to account for any mitigating factors, including, Manka's assertion that he acted in self-defense or the fact that he suffered from mental illnesses. To the contrary, this information was included within the PSI and the court explicitly referenced these facts in its comments prior to sentencing. Moreover, the court noted that it considered all of the factors relevant to Manka's current offenses and his current circumstances. Given Manka's extensive criminal history, the serious and violent nature of his current offenses, and his status as a habitual offender, we simply cannot say that the sentences imposed by the district court amounted to an abuse of discretion.

### V. CONCLUSION

Upon our review, we affirm Manka's convictions and sentences. The court properly overruled both Manka's motions to sever certain counts and his motion to suppress evidence that he possessed a controlled substance. There was sufficient evidence presented at trial to support the jury's verdict finding Manka guilty of first degree assault in the shooting of Galusha. Manka was

not prejudiced by wearing visible restraints when the jury rendered its verdict in open court and the district court did not impose excessive sentences.

AFFIRMED.